# EXHIBIT 1

## IN THE STATE COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| TROY WELKER and MIN TURNER, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION FILE |
| | ) | NO. _____ |
| v. | ) | |
| | ) | |
| MIMEDX GROUP, INC., J. TERRY | ) | |
| DEWBERRY, CHARLES R. EVANS, | ) | |
| PARKER H. PETIT, MICHAEL J. | ) | |
| SENKEN, and WILLIAM C. TAYLOR, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs Troy Welker and Min Turner hereby file this Complaint, alleging

on information and belief:

## NATURE OF ACTION

1.

Plaintiffs were early and enthusiastic investors in Defendant MiMedx Group

Inc. ("MiMedx" or the "Company"), a biomedical engineering company that

experienced exceptional growth starting in 2012.  By April 2017, Plaintiffs

collectively owned more than $12,000,000 of MiMedx common stock.

2.

Plaintiffs' belief in MiMedx and the statements and representations of

MiMedx's leadership led Plaintiffs to look for ways to further expand their

investment in the Company.

3.

Starting in September 2017, Plaintiffs began purchasing MiMedx call options.  A call option is a contract that entitles the buyer to purchase shares in a company at a certain price, called the "strike" price, on or before a certain date, called the "expiration" date.

4.

By July 2018, Plaintiffs had purchased approximately $4,000,000 in MiMedx call options.

5.

From approximately 2012 through 2018, MiMedx's leadership represented to the investing public, including Plaintiffs, that the path ahead for MiMedx was very positive.  The Company's performance indicators reported to the public, including Plaintiffs, supported these representations.

6.

But the key officers and directors at MiMedx knew the truth was far less rosy.

7.

MiMedx and its leadership was aware, but did not disclose to Plaintiffs or other investors, that the Company's stellar growth had been inflated by phantom

sales and improper accounting practices.  Rather than tell the truth, MiMedx

focused its efforts on cover-ups and punishments for whistleblowers.

8.

MiMedx's cover-up efforts ultimately failed.  On November 7, 2018,

MiMedx's stock was delisted by NASDAQ.  And on December 5, 2018, MiMedx

announced that its outside auditor, EY, had resigned because EY had found that

"internal controls necessary for the Company to develop reliable financial

statements ***do not exist***."

9.

MiMedx performed three internal investigations into allegations that the

Company inflated its sales and financial performance.

10.

On May 23, 2019, MiMedx released a summary of its third internal

investigation, conducted by the law firm of King & Spalding and the accounting

firm KPMG.

11.

Whereas the first two internal investigations found no wrongdoing by

MiMedx, its officers, and directors, the third investigation found, among other

things, that MiMedx's most senior officers had for years engaged in serious

wrongdoing and had made material misstatements to the investing public,

3

regulators, and outside auditors.  The third investigation concluded that this misconduct had harmed shareholders including Plaintiffs.

12.

MiMedx's stock price plummeted, erasing more than $1 billion from the Company's market capitalization.  As a result of the falling stock price and the delisting of MiMedx's stock, Plaintiffs' call options became nearly worthless.

13.

On November 25, 2019, the Company's former Chairman and CEO, Parker H. Petit ("Petit"), and former COO, William C. Taylor ("Taylor"), were indicted by the United States Attorney for the Southern District of New York.  The indictment described in great detail the false and misleading annual and quarterly SEC filings, press releases, and other public statements that were reviewed, signed, and/or issued by Petit and Taylor.  The vast majority of these statements were made in, or issued from, Marietta, Georgia.

14.

At trial, the government introduced evidence that Petit and Taylor, with the knowledge and assistance of others inside and outside the Company, conducted a years-long scheme to inflate MiMedx's sales and thereby the share price of the Company.  As part of the scheme, MiMedx, Petit, and Taylor paid bribes to distributors, threatened whistleblowers, and repeatedly lied to the public.

15.

On November 19, 2020, following a four-week trial, a jury convicted Petit of securities fraud pursuant to 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. 240.10b-5. The jury convicted Taylor of conspiracy to commit the same violations of federal securities law.

16.

Petit and Taylor appealed their convictions.  Among other challenges, Petit and Taylor argued the government had failed to prove that they acted knowingly and willfully when they misstated MiMedx's financial performance.

17.

On August 22, 2022, the United States Court of Appeals for the Second Circuit affirmed both convictions.  The federal appellate court found there was sufficient evidence to support the jury's finding, beyond a reasonable doubt, that Petit (1) knowingly and willingly, (2) made untrue statements of material fact, (3) to the investing public through official filings, (4) with the specific intent to defraud or deceive, and that Taylor conspired to do the same.

18.

Petit and Taylor were able to carry out the years-long fraudulent scheme because they were assisted by the Company's CFO, Michael J. Senken ("Senken"), members of the Board of Director's Audit Committee, including J. Terry Dewberry

("Dewberry") and Charles R. Evans ("Evans"), and others inside and outside MiMedx.

## PARTIES, JURISDICTION, AND VENUE

19.

Plaintiffs Welker and Turner are residents of the State of Florida.

20.

Plaintiffs' relevant purchases and sales of securities were made in Georgia. Plaintiffs' injuries were sustained in Georgia.

21.

Welker is a former police officer and a self-made business owner who started a sink company in his house.  Together, Welker and co-plaintiff Turner built the company into a large, successful operation, ultimately selling it to Elkay Plumbing Products Company.

22.

Defendant MiMedx Group, Incorporated is a Florida corporation with its principal place of business located at 1775 West Oak Commons Court, Marietta, Georgia 30062.  MiMedx can be served with process by and through its registered agent, William F. Hulse, at the same address.

23.

MiMedx was formed on or about March 31, 2008.  MiMedx has traded on

the NASDAQ Capital Market Exchange under the symbol "MDXG."

24.

Defendant J. Terry Dewberry ("Dewberry"), a citizen of Georgia, served as a director of the Company starting in September 2009.  Dewberry was also Chairman of the Audit Committee of MiMedx's Board of Directors, serving in that role starting in or around October 2012.  Dewberry resides, and can be served, at 1960 Allgood Road, Marietta, Cobb County, Georgia 30062.

25.

Defendant Charles R. Evans ("Evans"), a citizen of Georgia, served as a director of MiMedx starting in or around September 2012.  Following the resignation of Defendant Parker H. Petit, Evans became Chairman of the Board of Directors.  Evans also served as a member of MiMedx's Audit Committee starting in or around October 2012.  Evans resides, and can be served, at 14925 East Bluff Road, Alpharetta, Fulton County, Georgia, 30004.

26.

Defendant Parker H. Petit ("Petit"), a citizen of Georgia, joined MiMedx as Chief Executive Officer (CEO), President, and Chairman of the Board of Directors on or about February 24, 2009.  Petit held those positions until June 30, 2018.  Petit resides, and can be served, at 3005 Evelyn Lane, Alpharetta, Fulton County, Georgia 30004.

7

27.

Defendant Michael J. Senken ("Senken"), a citizen of Georgia, was Chief Financial Officer ("CFO") of MiMedx from approximately January 15, 2010 through June 6, 2018.  Senken was subsequently terminated from the Company on or about June 30, 2018.  Senken resides, and can be served, at 315 Lakeside Terrace, Canton, Cherokee County, Georgia 30115.

28.

Defendant William C. Taylor ("Taylor") a citizen of Georgia, joined MiMedx on or about September 22, 2009, as the Company's Chief Operating Officer ("COO") and President.  Taylor was named a Director on October 25, 2011.  Taylor held those positions until June 30, 2018.  Taylor resides, and can be served, at 413 Waverly Place, Woodstock, Cherokee County, Georgia 30188.

29.

Defendants Dewberry, Evans, Petit, Senken, and Taylor are collectively referred to as the "Individual Defendants."

30.

The Individual Defendants are subject to personal jurisdiction as each is a resident of the State of Georgia.

31.

MiMedx is subject to personal jurisdiction because it (1) has its headquarters

8

in Marietta, Georgia (2) transacts business in the State of Georgia, (3) committed

tortious acts or omissions within the State of Georgia, and (4) owns, uses, or

possesses real property situated within the State of Georgia.  *See* O.C.G.A.

§ 9-10-91(1), (2), (4).

32.

Venue is proper in Fulton County because Defendants Petit and Evans are

residents of Fulton County, and any non-resident Defendants may be sued in this

court as joint tort-feasors.  O.C.G.A. § 9-10-31.

<b><u>FACTUAL ALLEGATIONS</u></b>

<b>MiMedx Reports Prodigious Growth</b>

33.

MiMedx is a biopharmaceutical company that focuses on supplying

biomaterials for soft tissue repair and other medical applications.

34.

From 2012 through late-2017, MiMedx reported tremendous growth,

including five straight years of more than 50% sales growth.  In 2017, MiMedx

was recognized as No. 5 on Fortune's Fastest Growing Public Companies.

35.

Throughout this time, MiMedx routinely represented that it had impressive

sales, business successes, and revenue increases, while forecasting significant

9

future growth.  The Company's public filings consistently announced the effectiveness of the Company's internal controls.

36.

The stock market reacted favorably to MiMedx's sales reports, financial projections, and assurances that it maintained adequate internal controls. MiMedx's stock price rose from roughly $4 per share at the beginning of 2013 to $17 per share by the beginning of 2018.

**MiMedx Delays Release of Financial Results**

37.

On February 20, 2018, MiMedx announced that it was postponing the release of its fourth quarter and fiscal year 2017 financial results due to "an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company" and "the accounting treatment of certain distributor contracts."[1]

38.

At the same time, MiMedx assured the investing public that "the outcome of such investigation should not have a material impact on revenue guidance for 2018."[2]

---

[1] February 20, 2018 MiMedx Press Release, *MiMedx Postpones Release of its Fourth Quarter and Fiscal Year 2017 Financial Results* (**Exhibit A**)
[2] *Id.*

39.

Wall Street analysts at PiperJaffray issued a report on February 20, 2018, commenting that "we are encouraged that the company reiterated guidance." PiperJaffray continued to "recommend shares to investors with a higher risk tolerance" until more information was available from the on-going internal investigation.

**Plaintiffs Increase Their Options Holdings**

40.

Following the February 20, 2018 announcement, MiMedx's stock price fell from $14.47 to $8.75.

41.

Plaintiffs had been stalwart investors in the Company for nearly half a decade. While Plaintiffs primarily had owned MiMedx common stock, they had also purchased a few call options on MiMedx's stock prior to February 2018.

42.

Relying on misrepresentations that the internal investigation would not have a material impact, Plaintiffs substantially increased their purchase of MiMedx call options on February 27, 2018. Whereas Plaintiffs previously owned call options contracts entitling them to purchase a few thousand MiMedx shares, they now had the right to purchase hundreds of thousands of MiMedx shares.

43.

The majority of the call options contracts purchased in February 2018 had a strike price of $5.00 and were set to expire on January 17, 2020.  Plaintiffs paid an average of $3.65 per share for these options contracts.

44.

To avoid a loss, Plaintiffs would need to exercise their call options when the MiMedx share price was trading at or above $8.65 (the per share cost of the call option contract ($3.65), plus the strike price of the share ($5.00)).  MiMedx's stock price was trading between $7.00 and $8.00 on February 27, 2018.

45.

Plaintiffs' long-term investment reflected their belief, based on MiMedx's public statements, that within two years MiMedx would be back on track.

46.

That belief seemed to be vindicated when, on March 15, 2018, just two weeks after Plaintiffs purchased the majority of their call options, MiMedx announced that it anticipated exceeding the first quarter (Q1) of 2018 revenue guidance.[3]

47.

---

[3] March 15, 2018 MiMedx Press Release, *MiMedx Announces Expectations to Exceed the $92 Million Guidance* (**Exhibit B**)

MiMedx's positive public announcements continued throughout the Spring of 2018.  For example, during an April 26, 2018 earnings call, Taylor stated that the Company's "detailed planning, territorial management, discipline, education, execution and accountability, particularly through the use of our Sales Management System, or SMS, continues to drive predictable and sustainable results."

48.

In an April 26, 2018 press release, Petit announced that the "first quarter of [2018] revenue growth is a clear demonstration of the strength of our product lines, our sales management system and talent we have assembled in our sales and other key functions within our organization.  Based upon our strong first quarter performance, we have raised our full year revenue guidance from a previous range of $383 million to $387 million to a revised range of $389 million to $394 million."[4]

**MiMedx Announces Restatement and Leadership Changes**

49.

On June 7, 2018, however, MiMedx announced the need to restate certain previously issued consolidated financial statements for fiscal years ended

---

[4] April 26, 2018 MiMedx Press Release (**Exhibit C**).  The April 26, 2018 press release, and every other press release referenced in this Complaint includes "Marietta, Georgia" on the byline.

December 31, 2012-16, as well as for each of the interim periods ended March 31, June 30, and September 30, 2017.[5]

50.

The Company further announced that previously issued guidance and communications related to fourth quarter 2017 and for 2018 should no longer be relied upon.[6]

51.

Still, MiMedx stressed that its "underlying business remains strong," and it would "diligently pursu[e] completing of the Restatement … to make such filings as soon as reasonably practicable."[7]

52.

A few weeks later, MiMedx's leadership made clear they were taking seriously the issues that had led to the need to restate previously issued financials. On the morning of July 2, 2018, MiMedx announced that Petit was stepping down as Chairman and CEO, and Taylor was stepping down as President and COO.[8]

53.

At the same time, the Company announced a number of measures "to

---

[5] June 7, 2018 MiMedx Press Release, *MiMedx to restate certain financial statements* (**Exhibit D**)
[6] *Id.*
[7] *Id.*
[8] July 2, 2018 MiMedx Press Release, *MiMedx Announces Leadership Changes and Corporate Actions* (**Exhibit E**)

promote accountability and strengthen oversight" in connection with "accounting, corporate compliance and internal controls practices."[9]

54.

From the evening before MiMedx's June 7 press release to the evening following its July 2 press release, MiMedx's stock price dropped from $8.21 to $3.93.

55.

On July 2, 2018, Plaintiffs purchased an additional $172,520 in MiMedx call options, each of which had an expiration date of January 17, 2020 and a strike price of $2.50.

56.

Plaintiffs' reliance on the Company's public representations in their SEC filings and other public statements appeared to be justified. Throughout the Fall of 2018, MiMedx's stock price steadily climbed back to levels comparable to the stock price levels prior to the June 7, 2018 press release.

### NASDAQ Delists MiMedx and EY Resigns

57.

Unfortunately, as MiMedx's stockholders would belatedly learn, the reality was that the Company had made no real progress on the restated financials for

---

[9] *Id.*

years 2012-16 or the delayed 2017 and 2018 financials.  This placed the Company

at risk of being delisted by NASDAQ.

58.

MiMedx's shares had been publicly traded on the NASDAQ stock exchange

since December 2013, when the Company held its initial public offering of stock.

59.

For MiMedx's stock to remain listed on NASDAQ—allowing its stock

holders to freely buy and sell on the open market—the Company needed to meet

NASDAQ's requirements, including the requirement to timely file financial reports

with the SEC.  If a company fails to meet the requirements of its exchange, the

stock will be "delisted," after which the stock can only trade privately through

broker-dealer networks or "over the counter."  This is why stock is more valuable

when traded on a public exchange than when it is traded over the counter.

60.

Public companies are required to file with the SEC both annual reports, on a

SEC Form 10-K, and quarterly reports, on a SEC Form 10-Q.

61.

MiMedx failed to file a 10-K for 2017, violating of NASDAQ Rule

5250(c)(1).  In another violation of NASDAQ Rule 5250(c)(1), MiMedx also

failed to file a 10-Q for the first quarter of 2018.

62.

Those filings were non-negotiable requirements for MiMedx to remain listed by NASDAQ.  NASDAQ told MiMedx it had until August 28, 2018 to bring its filings current, or it would be delisted from the NASDAQ exchange.

63.

In an April 26, 2018 press release, MiMedx assured investors it would submit a plan to NASDAQ to regain compliance by May 1, 2018.[10]

64.

On July 10, 2018, however, MiMedx notified NASDAQ that it would be unable to bring its SEC filings up to date by the August 28, 2018 deadline.

65.

On July 20, 2018, MiMedx received a letter from NASDAQ, stating that, because MiMedx would not regain compliance with NASDAQ Rule 5250(c)(1) by the initial deadline, NASDAQ had determined that MiMedx's stock would be delisted unless the Company requested a hearing before a NASDAQ Listing Qualifications Panel ("Hearings Panel") by July 27, 2018.

66.

On September 20, 2018, MiMedx issued a press release announcing that the Hearings Panel granted MiMedx's request for continued listing of the Company's

---

[10] April 7, 2018 MiMedx Press Release (**Exhibit C**)

stock on NASDAQ through February 2019, subject to the conditions that MiMedx regain compliance with its SEC reporting obligations by that date and provide the Hearings Panel with certain interim progress reports.

67.

The September 20, 2018 press release stated that "[t]he Audit Committee is working diligently with its advisors to complete the investigation, and the Company is also working to prepare its financial statements for audit and regain compliance with its SEC reporting obligations and Nasdaq listing rules as soon as practicable."[11]

68.

MiMedx knew when it issued the press release that it would not be able to meet the SEC and NASDAQ requirements.  To file the required reports, the Company would need the approval of outside auditors.  To obtain outside auditor approval, the Company would need to be honest about its systemic accounting and revenue recognition issues.  MiMedx took none of these required steps.

69.

Sure enough, on October 31, 2018, the Company submitted a report to the NASDAQ Hearings Panel stating that MiMedx "has now determined that, for the

---

[11] September 20, 2018 MiMedx Press Release, *MiMedx Announces Nasdaq Listing Extension* (**Exhibit F**)

restatement period [2012 through 2017], it must conduct an assessment of revenue recognition for all of the Company's sales, which will prolong the amount of time it will take for the Company to prepare the restated financial statements."[12]

70.

MiMedx had spent the better part of 2018 telling NASDAQ and the market that the Company was working towards NASDAQ's listing requirements, it was actually concealing the true extent of its accounting and revenue recognition issues. Petit, Taylor, and Senken had left the Company, but their successors continued to make materially false, misleading, and incomplete disclosures.

71.

Following the Company's belated admission that it could not comply with listing requirements, NASDAQ delisted MiMedx. On November 7, 2018, MiMedx announced that NASDAQ would delist MiMedx's stock, effective at the open of business the next day, November 8, 2018.[13]

72.

While MiMedx's stock continued to trade over the counter, the damage was done. In response to the delisting, MiMedx's share price fell from a close of $6.22

---

[12] November 7, 2018 MiMedx 8-K (**Exhibit G**)
[13] November 7, 2018 MiMedx Press Release, *MiMedx Receives Nasdaq Delisting Notification* (**Exhibit H**)

on November 6, 2018, to a price of $3.66 at the close of the next day.

73.

On December 5, 2018, MiMedx announced that EY had "resigned from the engagement to audit the Company's financials for the years ended December 31, 2017 and 2018, effective immediately."[14]

74.

At this same time, MiMedx announced that up to 24% of its employees would be terminated.[15]

75.

As a result, MiMedx's stock price dropped even further, from $2.95 to $1.20.

76.

More information about EY's abrupt departure soon came to light.  In a Form 8-K filed with the SEC on December 7, 2018, MiMedx explained that EY had concluded "the internal controls necessary for the Company to develop reliable financial statements *do not exist*" and issues raised by EY during their engagement had "not been resolved to EY's satisfaction."[16]

---

[14] December 5, 2018 MiMedx Press Release, *MiMedx Announces Resignation of Outside Auditor* (**Exhibit I**)
[15] December 5, 2018 MiMedx Press Release, *MiMedx Announces Organizational Realignment Program* (**Exhibit J**)
[16] December 7, 2018 MiMedx Form 8-K (**Exhibit K**) (emphasis added)

77.

As investors including Plaintiffs discovered in November and December 2018, MiMedx had been hiding from NASDAQ, EY, the SEC, and the investing public the true depth and breadth of what was ultimately revealed to be a half-decade long fraud.

### MiMedx's Improper Revenue Recognition Schemes

78.

Starting around 2012, MiMedx employed a variety of schemes to inflate sales and meet revenue expectations.

79.

Defendants entered into special arrangements with some of MiMedx's distributors that allowed MiMedx to prematurely recognize revenue and facilitated a massive channel stuffing scheme.

80.

MiMedx's scheme involved shipping out or otherwise placing significant quantities of merchandise at the end of quarterly reporting periods in order to record revenue for such shipments, even though they were not true sales and could not be recognized as such under Generally Accepted Accounting Principles ("GAAP").

81.

Company sales representatives, pressured by senior management to meet increasingly unrealistic revenue expectations, sent inventory to distributors that the distributors did not plan on selling.

82.

MiMedx's sales representatives often ordered the products through distributors that never had control or title to the products and provided false documentation to help conceal the improper activity.

83.

MiMedx then falsely booked these orders and shipments as revenue before the products were returned.  The surplus products were later routed back to MiMedx, and the Company then used future revenues to mask the true losses associated with reclaiming the products.

84.

In doing so, MiMedx recognized revenue in violation of GAAP and financial accounting standards, which provide, among other things, that revenue may only be recognized at the time of sale if a buyer lacks the right to return the product.

85.

For years, MiMedx's fraudulent sales represented a significant percentage of reported revenues.

## MiMedx's Internal Investigations

86.

As Plaintiffs and other investors would later learn, MiMedx's improper

revenue recognition and channel stuffing schemes had been the subject of multiple

internal investigations conducted, in whole or in part, by the Audit Committee of

MiMedx's Board of Directors.

*Audit Committee Investigation I ("ACI")*

87.

The first investigation by the Board of Directors' Audit Committee (Audit

Committee I or "ACI") was set in motion in December 2015 by complaints made

by Mark Anderson, the Company's Controller at the time.

88.

On December 15, 2015, following an Audit Committee meeting, Senken and

Anderson met in Senken's office.  During the meeting, Anderson "stated very

directly and openly" that he had a "real concern" regarding MiMedx's "revenue

recognition" practices.

89.

On January 18, 2016, Anderson sent an e-mail to Senken with the subject

line, "Revenue Recognition and Controls," complaining of certain transactions

involving four of the Company's largest distributors.  Anderson stated that each of

these distributors failed to satisfy GAAP criteria that would allow MiMedx to

recognize revenue at the time of shipment.

90.

Anderson also identified internal control deficiencies related to sales

personnel extending payment terms and other incentives to customers. Anderson's

email to Senken stated, in part:

> I am concerned about MiMedx's revenue recognition and the $187.3
> million in revenue that we are reporting for full year 2015. This
> weekend I have learned new information. . . . Along with my concerns
> over revenue recognition, I am also concerned about the effectiveness
> of MiMedx's internal controls over financial reporting.... I am reporting
> these accounting and internal control concerns to you in good faith[.][17]

91.

Specifically, Anderson stated that revenue attributed to one of MiMedx's

distributors in 2015 was inflated because the distributor "has a right of return and

doesn't meet all of the exception criteria, and implicitly doesn't pay MiMedx until

the tissue has been implanted."[18]  Anderson also questioned the timing of revenue

recognition for sales to the distributor in years prior to 2015.

92.

Anderson also questioned revenue recognition related to three additional

MiMedx distributors.

---

[17] Investigation Update at p. 7, *United States v. Petit*, No. 19-cr-00850-JSR (SDNY Feb, 10, 2020), ECF No. 38-3 (**Exhibit L**)
[18] *Id*.

93.

Based on these concerns, Anderson refused to sign a management

representation letter in connection with the Company's 2015 audit.

94.

On January 19, 2016, Senken had another meeting with Anderson and two

other MiMedx employees.[19]  Senken asked Anderson to explain his concerns.  In

response, Anderson shared GAAP references supporting his concerns regarding

revenue recognition.

95.

Senken responded that Anderson did not have all the facts and

circumstances, and that "these practices were just normal business" and "were the

way things had always been done" at MiMedx.[20]

96.

Also on January 19, 2016, Senken forwarded Anderson's e-mail to

Dewberry, the Chairman of the Company's Audit Committee.[21]  Senken's email

included "management's draft response" to Anderson's complaint, which Senken

---

[19] Notes of Witness Interview at p. 2, *United States v. Petit*, No. 19-cr-00850-JSR (SDNY Feb, 10, 2020), ECF No. 24-20 (**Exhibit M**)

[20] *Id.*

[21] Complaint at ¶ 221, *Securities and Exchange Commission v. MiMedx Group, Inc., Parker H. Petit, William C. Taylor, Michael J. Senken*, No. 19-cv-10927 (S.D.N.Y. Nov. 26, 2019) ("SEC Compl.") (**Exhibit N**).

had prepared with the assistance of Petit and Taylor ("Management Response").[22]

97.

The Management Response rejected Anderson's contentions and questioned his understanding of the facts.  The Management Response failed to disclose the true facts and circumstances surrounding MiMedx's transactions with the distributors at issue.[23]

98.

Petit, Taylor, and Senken caused MiMedx to remove Anderson from the Controller position so he would not have to sign the management representation letter in connection with the 2015 audit.[24]

99.

Dewberry, and certain other members of the Audit Committee, met with Anderson on February 11, 2016, ostensibly to discuss Anderson's concerns.

100.

Following the February 11, 2016 meeting, the Audit Committee adopted each of the arguments in the Management Response.  ACI found no merit to Anderson's concerns.  Anderson left the Company that same day.

---

[22] *Id.*
[23] *Id.* at ⁋ 224-225.
[24] SEC Compl. at ⁋ 226.

101.

The Audit Committee commenced and completed ACI in only 21 days. On January 19, 2016, the first day of the investigation, the Audit Committee, including Dewberry and Evans, received the "proposed" response of Petit, Taylor, and Senken. On February 11, 2016, the last day of the investigation, the Audit Committee, including Dewberry and Evans, adopted Petit, Taylor, and Senken's position.

102.

During the 21-day investigation, MiMedx's outside auditor never met with Anderson.[25] Neither the outside auditor nor the Audit Committee interviewed the distributors that were the subject of Anderson's concerns.

103.

Yet, later in February 2016, Petit signed a management representation letter to the outside auditor falsely stating that "all sales recorded by the Company to new distributors in 2015 have met the four criteria for revenue recognition pursuant to ASC 605, *Revenue Recognition*."[26] Based on Petit's representation, and with knowledge of Anderson's complaints, the outside auditor then issued a clean audit opinion for 2015.

---

[25] Notes of Witness Interview (**Exhibit M**)
[26] SEC Compl. at ⁋ 235.

*Audit Committee Investigation II ("ACII")*

104.

The second Audit Committee investigation (Audit Committee II or "ACII") was set in motion in fall of 2016 by complaints made by Jess Kruchoski and Luke Tornquist, two members of MiMedx's sales team.

105.

Kruchoski and Tornquist had sold $461,000 worth of MiMedx products to the Minneapolis Veterans Administration Hospital.  But MiMedx refused to pay Kruchoski and Tornquist full sales commission on the sale.[27]

106.

On October 31, 2016, Kruchoski and Tornquist were told they were not entitled to part of the commission because MiMedx did not identify the sale as "growth" but rather, as Taylor put it, as "revenue that [MiMedx] had already recognized."[28]

107.

Taylor admitted to Kruchoski that the revenue previously recognized by MiMedx was "phony growth" because MiMedx previously had to credit the

---

[27] First Amended Kruchoski/Tornquist Complaint, *Kruchoski v. MiMedx Grp., Inc*., No. 16-cv-04171-RHK-BRT (D. Minn. Dec. 15, 2016) ECF No. 4 ("Kruchoski Complaint") (**Exhibit O**)
[28] Kruchoski Counterclaim at ¶ 86, *MiMedx Grp., Inc. v. Academy Med., LLC*, No. 2016 CA 013806 (Fla. Palm Bch. Cir. Ct. June 4, 2019) ECF No. 291 (**Exhibit P**)

distributor for the same products, meaning the Company's net revenue on the transaction was zero.[29]

108.

On November 2, 2016, Kruchoski sent an e-mail to Petit, Taylor, Cashman, and others, entitled, "Complaint – Jess Kruchoski and Luke Tornquist."[30]  In the email, Kruchoski demanded that the Company investigate and rectify improper revenue recognition practices concerning MiMedx's distributors.[31]

109.

The next day, on November 3, 2016, Tornquist received a phone call from his boss, Central Area Vice President Steve Blocker, regarding the complaint email.[32]  Blocker conveyed that maintaining the complaint would "not be good for" Tornquist, reminded Tornquist that he had a wife and children, and cautioned Tornquist to "think of [his] family."[33]

110.

On November 4, 2016, Kruchoski e-mailed General Counsel Haden, stating, "I have gained full realization that the company is misrepresenting our revenue[,]" "I was told by a member of upper management that Pete Petit[] insisted this

---

[29] *Id.*
[30] Kruchoski Email to Haden (**Exhibit Q**)
[31] *Id.*
[32] Tornquist Counterclaim at ⁋ 81 (**Exhibit P**)
[33] *Id.* at ⁋ 82.

[channel stuffing] occur and that anyone who did not comply would be negatively treated[,]" and "I believe that MiMedx is reporting Government revenue before it has been either [sic] realized, and is deliberately delaying the reporting of returns so as to report net profits.  This results in false or misleading statements to the SEC, shareholders, and the investing community."[34]

111.

Counsel for Kruchoski and Tornquist also sent MiMedx a demand letter describing a variety of improper and illegal conduct related to MiMedx's relationship with distributors, including channel stuffing, improper revenue recognition, and health care fraud.[35]

112.

On the morning of December 12, 2016, Petit and Taylor, along with half a dozen other senior executives, held an emergency meeting in the executive board room of MiMedx's Marietta, Georgia headquarters.

113.

During the meeting, Petit stated that Kruchoski and Tornquist would be sorry that they engaged in "this action."[36]  Petit also stated, in an aggressive tone

---

[34] Kruchoski Email to Haden (**Exhibit Q**)
[35] SEC Compl. at ¶ 236 (**Exhibit N**)
[36] Fox Counterclaim at ¶ 84, *MiMedx Grp., Inc. v. Fox*, No. 16-cv-11715 (N.D. Ill. Jan. 31, 2018) ECF No. 147 (**Exhibit R**)

while slamming his hand on a binder lying on the table, that Kruchoski and Tornquist would feel immense pain for what they were doing.[37]  Further, Petit stated that Kruchoski and Tornquist would be "financially hit," "their families and futures will feel it," and they would be "hurt professionally and with every possible resource available."[38]

114.

According to Petit, Kruchoski and Tornquist "and any other who did similarly would be dealt with quickly and harshly."[39]

115.

True to Petit's word, MiMedx quickly retaliated against Kruchoski and Tornquist.  On the same day as the "emergency meeting," MiMedx terminated their employment.  The Company then quickly filed a series of frivolous lawsuits against Kruchoski and Tornquist.

116.

On December 15, 2016, Tornquist and Kruchoski filed a formal whistleblower complaint with the SEC declaring, under penalty of perjury, the truthfulness of their allegations.

---

[37] *Id.*
[38] *Id.*
[39] *Id.*

117.

On the same day, Kruchoski and Tornquist filed civil claims against MiMedx in federal court.  MiMedx promptly released public statements denying the allegations.

118.

Around the same time, the Company's Audit Committee commenced Audit Committee investigation II, or ACII.[40]

119.

Only a couple of weeks after commencing ACII, on December 27, 2016, Dewberry, Evans, and the Audit Committee announced their preliminary findings of ACII, stating that the Audit Committee has "advised the Company's management and the Board of Directors that it has found no credible evidence to indicate that any changes to previously issued financial statements are necessary in light of these [the Kruchoski and Tornquist] allegations."

120.

On March 1, 2017, MiMedx issued a press release announcing that ACII was complete, and that the investigation had formally absolved the Company of any wrongdoing.

---

[40] SEC Compl. at ⸿ 237 (**Exhibit N**).

121.

Also on March 1, 2017, Petit and Senken signed another management representation letter for the Company's outside auditor, falsely stating that MiMedx and its distributors have no "[s]ide agreements or other arrangements (either written or oral) that have not been disclosed to you[.]"[41]

122.

After Petit and Senken signed the letter, the outside auditor issued a clean audit opinion as to the presentation of MiMedx's 2016 financial statements.

*Audit Committee Investigation III ("ACIII")*

123.

On February 20, 2018, when MiMedx announced it had postponed the release of its financial results for fourth quester and fiscal year 2017, the Company also announced the launch of Audit Committee investigation III ("ACIII").[42]

124.

MiMedx described ACIII as "an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company," including "the accounting treatment of certain distributor contracts," conducted by "independent legal and accounting advisors"

---

[41] *Id*. at ¶ 252.
[42] February 20, 2018 MiMedx Press Release (**Exhibit A**)

engaged by the Audit Committee.[43]

125.

On February 23, 2018, MiMedx held a conference call to discuss ACIII and

postponement of the Company's fourth quarter and fiscal year 2017 financial

results.  On the call, Petit and Taylor expressed uncertainty as to the duration and

scope of ACIII.

126.

Petit stated that:

The Audit Committee of our Board of Directors has engaged King &
Spalding as its legal counsel to conduct an independent investigation
[ACIII] with the assistance of KPMG, another Big 4 accounting firm,
as a forensic accountant. While the timeframe for the completion has
not been determined, the audit committee is working closely with its
advisers to complete the investigation in as timely a manner as possible.

127.

Taylor added:

So with the first question, how long would this investigation take? The
board and their independent advisers are working to complete this in as
timely [a] manner as possible. Because this is an independent
investigation [ACIII], management is not in control of that time line.
Second question, whether – is there a certain period of time in particular
that is in question? And the answer on that one is, at this point in time,
we're only able to say that the internal investigation [ACIII] will review
matters related to current and prior period manners – matters, excuse
me.  The next question was whether the company's review of certain
distributor contracts are all-compassing [sic], or are there specific
partners that are being looked at.  Well, while we are limited to what

---

[43] *Id.*

we can say, I can tell you that the independent investigation [ACIII] will look at matters related to allegations about sales and distributor practices. Company executives are also reviewing the accounting treatment of certain distributor contracts.

128.

During the call, Petit continued to lie to investors:

We certainly believe you can expect our revenue growth to continue at a rapid rate. The company reiterated revenue guidance for the year of $383 million to $387 million. Also, our cash flow remains very strong and we anticipate that to continue.

129.

Taylor also falsely stated:

The audit committee's independent investigation [ACIII] should not affect our operational performance . . . . As I addressed in my remarks, we've been experiencing rapid growth over the last few years . . . . We expect to continue to deliver operational . . . successes in the months and years to come.

130.

On February 27, 2018, the Company issued another knowingly and willfully false press release that reaffirmed its 2018 revenue guidance notwithstanding ACIII:

[B]ased on information available to date, the independent investigation by [MiMedx's] Audit Committee and their legal and accounting advisors [ACIII] should not have a material impact on the Company's 2018 revenue guidance of $383 million to $387 million.[44]

---

[44] February 27, 2018 MiMedx Press Release (**Exhibit S**)

131.

On April 26, 2018, the Company lied again, this time <u>raising</u> guidance for

2018:

> The first quarter [2018] revenue growth is a clear demonstration of the
> strength of our product lines, our sales management system and the
> talent we have assembled in our sales and other key functions within
> our organization. Based upon our strong first quarter performance, we
> have raised our full year revenue guidance from a previous range of
> $383 million to $387 million to a revised range of $389 million to $394
> million.[45]

132.

Petit added the knowingly and willfully false statement that MiMedx's stock

price was "undervalued."  When Petit made this statement, he knew that the full

extent of his years-long fraud had not yet come to light and that, when it did, the

Company's stock price would only plummet further.

133.

On June 7, 2018, MiMedx issued a press release announcing that

preliminary findings of ACIII regarding revenue recognition practices had shown

the Company's reported financial results for fiscal years 2012-2016 and the first

three quarters of 2017 were not reliable and would have to be restated.[46]

---

[45] April 26, 2018 Press Release (**Exhibit T**)
[46] June 7, 2018 MiMedx Press Release (**Exhibit D**).

134.

MiMedx also stated that all communications and financial information with respect to fourth quarter 2017 and first quarter 2018 were no longer reliable and withdrew its increased 2018 guidance.[47]  In the same press release, MiMedx announced that Senken and several other key employees had left the Company effective June 6, 2018.[48]

135.

When Petit and Taylor made their optimistic statements about revenue guidance in February and April of 2018, they already knew the information that forced MiMedx to abandon that revenue guidance on June 7, 2018.

136.

A few weeks later, on July 2, 2018, it was announced that Petit and Taylor had resigned based on "information the Audit Committee has identified through its previously announced independent investigation [ACIII]."[49]

137.

Plaintiffs and the investing public remained largely in the dark in the Fall of 2018.  Financial statements were no longer being published.  MiMedx continued to

---

[47] *Id.*
[48] *Id.*
[49] July 2, 2018 MiMedx Press Release (**Exhibit E**).

represent it was on its way to meeting all of NASDAQ's listing requirements, but little information regarding those efforts was offered.

138.

On April 11, 2019, more than ten months after the announcement of the need to restate past financials, MiMedx issued another opaque, misleading press release, disclosing that "[t]he Company continues to work diligently to complete the financial restatement."  But MiMedx was unable to provide clarity on the timelines for completion of the Restatement or selection of a new auditor.

139.

The press release further stated:

Due to the depth, breadth and complexity of issues identified through the Audit Committee's investigation [ACIII], the scope of work in connection with the preparation of the Company's restated financial statements was expanded. Investigative efforts initially focused on the accounting practices around specific distributors between 2012 and 2017. Additional concerns related to other customer accounts resulted in the need to analyze the Company's revenue recognition practices for all years from 2012 to 2018[.]

140.

On May 23, 2019, MiMedx finally announced the results of ACIII.  Petit, Taylor, Senken and other key MiMedx employees had misrepresented or failed to disclose material facts about MiMedx's distributor agreements, revenue recognition practices, and revenue guidance.  MiMedx further admitted that it had lied to investors, as well as to the SEC and outside auditors, among others.

141.

ACIII found, among other things:

(i)     MiMedx's leadership had engaged in "longstanding material misconduct";

(ii)    The Individual Defendants knew that MiMedx's highly touted revenue growth was substantially the result of channel stuffing and other improper sales and distribution practices that inflated MiMedx's revenues to achieve its previously announced revenue targets;

(iii)   Under Petit's leadership and direction, MiMedx prematurely recognized revenue on approximately $870 million of sales from 2012 through the third quarter of 2017 and continued lying about it thereafter;

(iv)    The Board of Directors, including the Audit Committee led by Dewberry, failed to appropriately respond to allegations of improper accounting activities, improper sales practices, and activities consistent with retaliation against employees who raised concerns of such inappropriate accounting and sales activity."[50]

---

[50] May 23, 2019 Form 8-K, Audit Committee Findings (**Exhibit U**).

142.

MiMedx also finally admitted that the Dewberry-led investigations (ACI and ACII) "cannot be relied upon."[51]  The earlier, supposedly "independent" investigations had been shams.

143.

For example, during ACI, Dewberry, Petit's personal friend and longtime colleague in various business, had merely adopted Petit, Taylor, and Senken's Management Response that was drafted *before* the Audit Committee had even begun investigating the allegations of revenue recognition and accounting fraud.

144.

ACIII was the first legitimate investigation conducted by MiMedx.  But it was too little, too late.  In the time that passed between ACI and ACIII, Petit, Taylor, Senken, Dewberry, and Evans had made or facilitated countless knowingly and willfully false, material statements to the public.  In that time, NASDAQ delisted MiMedx, EY resigned because it found that internal controls did "not exist," and the share price plummeted.

145.

As a direct and proximate result of Defendants' conduct, Plaintiffs lost millions of dollars.

---

[51] *Id.*

**Defendants' Knowingly and Willfully Made False Statements and
Failed to Disclose Material Information**

146.

Defendants repeatedly announced, in 2012-2018, financial results,

projections, and other statements while knowing the statements were false.

Defendants also failed to disclose material information that should have been

disclosed to the investing public including Plaintiffs.[52]

147.

MiMedx's SEC Forms 10-K and 10-Q filed in 2012-2016 were signed by

the Individual Defendants, and represented that Petit and Senken had evaluated the

effectiveness of MiMedx's disclosure controls and procedures.

148.

MiMedx's 2012 Form 10-K, filed March 15, 2013, and signed by the

Individual Defendants, falsely claimed that MiMedx's disclosure controls and

procedures were "designed to provide reasonable assurance that information

required to be disclosed by the Company in [SEC filings was accurate]," and that

MiMedx's disclosure controls and procedures were effective.[53]  The 2012 Form

10-K was certified as accurate by Petit and Senken pursuant to the Sarbanes-Oxley

---

[52] Appendix 1 to the Complaint contains examples of Defendants' material false statements and
omissions.
[53] March 15, 2013 MiMedx Form 10-K (**Exhibit V**)

Act of 2002 ("SOX").[54]

149.

MiMedx's 2013 Form 10-K, filed on March 4, 2014, signed by the Individual Defendants, and certified as accurate pursuant to SOX by Petit and Senken, again reassured the market that MiMedx's disclosure controls and procedures were effective.[55]

150.

MiMedx's 2014 Form 10-K, filed on March 13, 2015, signed by the Individual Defendants, and certified as accurate pursuant to SOX by Petit and Senken, again reassured the market that MiMedx's disclosure controls and procedures were effective.[56]

151.

Among other misrepresentations, the 2014 Form 10-K claimed that revenue was recorded in the proper quarter.  Defendants knew this was false at the time.[57]

152.

MiMedx's 2015 Form 10-K, filed on February 29, 2016, signed by the Individual Defendants, and certified as accurate pursuant to SOX by Petit and

---

[54] *Id.*
[55] March 4, 2014 MiMedx Form 10-K (**Exhibit W**)
[56] March 13, 2015 MiMedx Form 10-K (**Exhibit X**)
[57] *Id.*

Senken, again reassured the market that MiMedx's disclosure controls and procedures were effective.[58]

153.

Among other misrepresentations, the 2015 Form 10-K claimed that revenue was recorded in the proper quarter.  Defendants knew this was false at the time.[59]

154.

MiMedx's 2016 Form 10-K, filed on March 1, 2017, signed by the Individual Defendants, and certified as accurate pursuant to SOX by Petit and Senken, informed the public that MiMedx had identified a deficiency in MiMedx's internal control over financial reporting relating to its accounting for income taxes.[60]

155.

The 2016 Form 10-K assured the investing public that MiMedx had developed and was implementing a remediation plan to address the control deficiency that led to this issue.[61]  Defendants knew this was false at the time. MiMedx also made no mention of the systemic improper revenue recognition scheme that had been propping up its performance for years.

---

[58] February 29, 2016 MiMedx 10-K (**Exhibit Y**)
[59] *Id.*
[60] March 1, 2017 MiMedx Form 10-K (**Exhibit Z**)
[61] *Id.*

156.

In this same time period (2012-2017), MiMedx also filed dozens of SEC Form 8-Ks that contained equally false statements by Defendants, who knew the statements were false when they made them.

157.

Though MiMedx ceased filing audited financials in early 2018, Defendants continued to make knowingly and willfully false statements and omissions about the quality of MiMedx's internal controls and the extent of its exposure from the fraudulent revenue recognition and accounting practices.

**Petit and Taylor's Criminal Convictions**

158.

Recognizing that this fraud started at the very top, the United States Attorney for the Southern District of New York indicted Petit and Taylor on November 25, 2019, charging each with securities fraud and conspiracy to commit securities fraud.[62]

159.

The indictment explained that Petit and Taylor "repeatedly touted their understanding of [SEC public reporting requirements and GAAP revenue

---

[62] Indictment, *United States v. Parker H. Petit and William Taylor*, No. 19-cr-850-JSR (S.D.N.Y. Nov. 25, 2019) (**Exhibit AA**)

recognition rules] both within MiMedx and to the investing public."[63]

160.

The indictment alleged scores of knowingly and willfully false statements by Petit and Taylor regarding internal controls, revenue recognition practices, distributor agreements, revenue projections, and financial performance.

161.

The indictment described Petit and Taylor's "Accounting Fraud Scheme," and explained some of Petit and Taylor's conduct in executing the scheme, including paying inducements (*i.e.*, bribes) to distributors.[64]  Petit and Taylor paid certain distributors to accept MiMedx products that the distributor had no intention of selling to customers.

162.

Petit and Tayler called the bribes "consulting arrangements," which the indictment called a sham because no consulting work was ever performed by those taking Petit and Taylor's bribes.[65]

163.

The indictment recognized that Petit and Taylor had not acted alone.  The scheme required the knowledge and participation of others inside and outside

---

[63] *Id.* at ¶ 12.
[64] *Id.* at ¶ 23.
[65] *Id.* at ¶ 24.

MiMedx, including members of the MiMedx sales team.  The indictment quoted an

email from a sales vice president to his sales team (copying Petit and Taylor)

stating that MiMedx should ship excess product to a certain distributor and then

"we will exchange it in July."[66]  In other words, ship the products, book the

revenue in this quarter, and then undo the transaction later, all in violation of

accounting requirements.

164.

The indictment detailed numerous examples of this scheme, directed by Petit

and Taylor, and executed by other MiMedx employees.

165.

The government's evidence took four weeks to introduce at trial. The

government's case showed that Petit, Taylor, and others at MiMedx schemed

together to inflate revenues, lied in filings to the SEC, and mislead auditors.

166.

The government argued to the jury, and offered documents and witness

testimony establishing, among many other things, that:

(i)     Petit and Taylor bribed Mark Brooks, the owner of CPM, one of

        MiMedx's distributors, to accept shipments of excess MiMedx products.

        After paying this bribe, but before being indicted, Petit lied to the SEC

---

[66] *Id.* at ¶ 26.

under oath and continued to insist that the bribe paid to Brooks was for legitimate consulting services;

(ii)     Petit orchestrated a loan from a trust he owned or controlled to the owner of another distributor, SLR, so that SLR could afford to pay for MiMedx products that SLR did not actually want to purchase;

(iii)    Petit and Taylor booked millions of dollars in sales to another distributor, Stability, that MiMedx was preparing to buy.  The owners of Stability were aware of the potential sale to MiMedx and therefore had no intention of paying MiMedx for the products MiMedx shipped to it;

(iv)    Petit and Taylor granted distributor First Medical a right to return $2 million in MiMedx products, hours after MiMedx's accounting department had advised Petit and Taylor this would violate revenue recognition rules; and

(v)     Petit, Taylor, and others at MiMedx hid and lied about these kinds of arrangements in dozens of public filings, press releases, and earnings calls.

167.

The government framed all of this conduct as different methods to accomplish a single goal: to knowingly and willfully inflate sales in order to inflate revenue in the eyes of the public, a violation of criminal securities laws.

168.

The fraudulent purchase agreements misled investors into believing that MiMedx had met its quarterly and annual revenue projections when, in reality, the purchase agreements were not fully realized, and the revenue was not subject to proper recognition.

169.

Following the four-week trial, the jury convicted Petit of securities fraud and convicted Taylor of conspiracy to commit securities fraud.

170.

Petit and Taylor appealed their respective convictions.  On August 22, 2022, a three-judge panel of the United States Court of Appeals for the Second Circuit rejected the appeals and affirmed the convictions of both Petit and Taylor.[67]

171.

As the Second Circuit panel explained, as a result of Petit and Taylor's fraudulent conduct, the investing public "purchased and sold MiMedx stock at values above what would have been paid had the actual value of the [distributor] contracts been reported."[68]

---

[67] Summary Order, *United States v. Petit, Taylor*, No. 21-543 (2d Cir. Aug. 22, 2022) (**Exhibit BB**)
[68] *Id*. at pp 4-5.

172.

Though the other Individual Defendants were not charged, the evidence presented at the Petit/Taylor trial established that the scheme could not have succeeded without the knowledge, acquiescence, and participation of MiMedx's CFO, Senken, and MiMedx's purported internal watchdog, the Audit Committee, which included Evans and Dewberry.

**The SEC Complaint Against Petit, Taylor, and Senken**

173.

On November 26, 2019, one day after the U.S. Attorney for the Southern District of New York filed its criminal indictment against Petit and Taylor, the Securities and Exchange Commission filed a civil complaint against Petit, Taylor, and Senken (the "SEC Complaint"). The SEC Complaint concerns largely the same conduct and transactions that were the subject of the criminal charges against Petit and Taylor.

174.

The SEC Complaint alleges that Senken reviewed each of MiMedx's quarterly and annual reports before they were filed with the SEC, signed certification required by sections 302 and 906 of the Sarbanes-Oxley Act, and signed each MiMedx annual and quarterly report.[69]

---

[69] SEC Compl. at ¶ 25 (**Exhibit N**).

49

175.

The SEC Complaint alleges that Senken, MiMedx's then-Chief Financial Officer, "repeatedly lied to and withheld critical information" in order to "cover up" Petit, Taylor, and Senken's misconduct.[70]

176.

By virtue of his position as CFO, Senken either knew or consciously avoided knowing that the distributor arrangements entered into by Petit and Taylor were intended to skirt revenue recognition rules and inflate sales.

177.

Senken also knew or consciously avoided knowing that the financial results and projections he was reviewing, signing, and issuing were materially false.  The SEC Complaint identifies more than <u>50</u> separate SEC filings reviewed and signed by Senken that contained material false statements and omissions.[71]

178.

Senken was an active participant in Petit and Taylor's schemes, and not merely an ignorant bystander.

179.

For example, as alleged above, during ACI, Senken (i) prepared (along with

---

[70] *Id.* at ¶ 8.
[71] *Id.* at ¶¶ 178-216.

Petit and Taylor) the knowingly and willfully false "Management Response," (ii) concealed material information from the Audit Committee, and (iii) moved the whistleblower from his position.[72]  Senken then reviewed and approved public statements that absolved MiMedx of any wrongdoing, knowing that these statements were false.

180.

The SEC case against Petit, Taylor, and Senken was largely stayed during the criminal proceedings against Petit and Taylor.  As of the date of the filing of this Complaint, the SEC case against Petit, Taylor, and Senken is ongoing and in discovery.

**MiMedx Refuses to Provide Plaintiff Welker with Information**

181.

On or about August 29, 2018, Plaintiff Welker sent a statutory demand to MiMedx seeking corporate records, including fundamental financial information regarding MiMedx.[73]

182.

Plaintiffs needed this information to help them decide whether to hold, exercise, or sell their MiMedx call options.

---

[72] *Id.* at ¶¶ 221, 224, 226.

[73] *See* Petition to Compel Production of Corporate Records and for Payment of Attorney's Fees and Costs, Case No. 2018CA002478 (Cir. Ct. Fla. Nov. 20, 2018) (**Exhibit CC**) at Ex. A.

183.

Welker received no information from MiMedx.

184.

Welker sent another demand on September 16, 2018.[74]  Again, MiMedx
flatly refused to provide any relevant information.[75]

185.

Instead, MiMedx litigated with Welker over a simple request for corporate
records.[76]

186.

Welker sent another demand on September 16, 2018.[77]  Again, MiMedx
flatly refused to provide even the most basic information.[78]

187.

On November 20, 2018, a few weeks after NASDAQ delisted MiMedx,
Welker sought to enforce his right to corporate information in a Florida state
court.[79]  Welker explained to the Florida court that shareholders had "been kept in
the dark" as MiMedx unraveled and the share price plummeted in 2018.  By that
time, MiMedx was not releasing any financial information to the public and no

---

[74] *Id.* at Ex. C.
[75] *Id.* at Ex. D.
[76] *Id.* at Ex. B.
[77] *Id.* at Ex. C.
[78] *Id.* at Ex. D.
[79] *Id.* at ¶ 27.

shareholder meetings had been held in the first 11 months of 2018.[80]

188.

On February 8, 2019, the Florida court ordered MiMedx to provide Welker with the information he had requested six months earlier.[81]

**Defendants' Conduct Damaged Plaintiffs**

189.

Defendants' actions devastated MiMedx's value.  MiMedx's market capitalization fell more than $1.67 billion, or 83.5%, from a high of nearly $2 billion in January 2018, to less than $264 million as of January 2019.

190.

As a result, Plaintiffs' call options, which derive their value from the value of MiMedx common stock, became nearly worthless.

191.

Plaintiffs unsuccessfully requested information from MiMedx so Plaintiffs could decide what to do with their call options.

192.

Plaintiffs held out as long as possible.  The vast majority of Plaintiffs' call options were set to expire on January 17, 2020.

---

[80] *Id.* at ¶¶ 27, 28.
[81] Order, Case No. 2018CA002478 (Fla. Cir. Ct. Feb. 8, 2019) (**Exhibit DD**) at Ex. A.

193.

In the week prior to expiration, Plaintiffs looked for any way to cut their losses.  Plaintiffs sold some of the options contracts at a fraction of their original cost.  Plaintiffs also exercised other options, despite the stock price sitting well below the $8.65 price that would have allowed Plaintiffs to break even on the majority of their call options.

194.

By January 17, 2020, Plaintiffs had lost more than $4,000,000 as a direct and proximate result of Defendants' conduct.

**Statute of Limitations**

195.

Defendants' fraud-based conduct tolled any applicable statute of limitations.

196.

The extent of Defendants' fraud was not discovered until the May 23, 2019 publication of MiMedx's Audit Committee Findings.

197.

Plaintiffs exercised reasonable due diligence to discover their causes of action, including by sending demands for corporate records on August 29, 2018 and September 16, 2018, and by pursuing a court action related to those demands through February of 2019.

198.

But Defendants fought and delayed Plaintiffs' efforts to collect information, debarring and deterring Plaintiffs from discovering the true nature and extent of the fraud.

199.

Any applicable statutes of limitations were also tolled during the criminal investigation and prosecution of Petit and Taylor.

## ALLEGATIONS COMMON TO COUNTS I & II
## GEORGIA RICO O.C.G.A. §§ 16-14-4(a), (b)

### *Acts of Racketeering Activity – Federal and State Securities Fraud*

200.

Defendants acts of racketeering activity included, but were not necessarily limited to, committing, attempting to commit, and soliciting, coercing, or intimidating other persons to commit securities fraud, in violation of both the "Georgia Uniform Securities Act of 2008," Chapter 5 of Title 10 of the Georgia Code[82] and federal securities laws.[83]

201.

A violation of the Georgia Uniform Securities Act is a predicate act under O.C.G.A. § 16-14-3(5)(A)(iii).  A violation of federal securities law is a predicate

---

[82] Including O.C.G.A. §§ 10-5-50, 10-5-57(a).
[83] Including 15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. 240.10b-5.

act under O.C.G.A. § 16-14-3(5)(C).

202.

Each Defendant engaged in two or more acts of securities fraud when, in connection with the offer, sale, or purchase of a security, directly or indirectly, they willfully (1) employed a device, scheme, or artifice to defraud, OR (2) made an untrue statement of a material fact or omitted a material fact necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading, OR (3) engaged in an act, practice, or course of business that operated as a fraud or deceit upon another person.

203.

Each Defendant engaged in two or more acts of securities fraud when they (1) knowingly and willfully, (2) made untrue statements of material fact, (3) to the investing public through official filings, (4) with the specific intent to defraud or deceive.

204.

Petit (1) employed a device, scheme, or artifice to defraud, made material statements and omissions, and engaged in an act, practice, or course of business that operated as a fraud or deceit upon another person, and (2) knowingly and willfully made untrue statements of material fact to the investing public through official filings with the specific intent to defraud or deceive.  Such acts include:

(i)     Petit made, certified, or approved the false and material statements

and omissions in the SEC Form 10-Q filed May 19, 2013[84] and SEC

Form 8-K dated May 1, 2013[85] issued for the first quarter of 2013,

including those statements and omissions regarding MiMedx's sales,

revenues, and fraudulent revenue recognition practices.  Petit

knowingly and willfully made or approved these false statements with

the specific intent to defraud or deceive the investing public and to

operate a fraud or deceit upon another person.

(ii)    Petit made, certified, or approved the false and material statements

and omissions in the SEC Form 10-Q August 8, 2013[86] and two SEC

Form 8-Ks dated July 19 & 31, 2013[87] issued for the second quarter of

2013, including those statements and omissions regarding MiMedx's

sales, revenues, and fraudulent revenue recognition practices.  Petit

knowingly and willfully made or approved these false statements with

the specific intent to defraud or deceive the investing public and to

operate a fraud or deceit upon another person.

(iii)   Petit made, certified, or approved the false and material statements

---

[84] See **Exhibit EE** and Appendix 1 at Row 2
[85] See **Exhibit FF** and Appendix 1 at Row 1
[86] See **Exhibit GG** and Appendix 1 at Row 5
[87] See **Exhibits HH**, **II** and Appendix 1 at Rows 3, 4

and omissions in the SEC Form 10-Q filed November 8, 2013[88] and

SEC Form 8-K dated October 30, 2013[89] issued for the third quarter of

2013, including those statements and omissions regarding MiMedx's

sales, revenues, and fraudulent revenue recognition practices.  Petit

knowingly and willfully made or approved these false statements with

the specific intent to defraud or deceive the investing public and to

operate a fraud or deceit upon another person.

(iv)    Petit made, certified, or approved the false and material statements

and omissions in the SEC Form 10-K filed March 4, 2014[90] and SEC

Form 8-K dated February 26, 2013[91] issued for the fourth quarter and

full year 2013, including those statements and omissions regarding

MiMedx's sales, revenues, and fraudulent revenue recognition

practices.  Petit knowingly and willfully made or approved these false

statements with the specific intent to defraud or deceive the investing

public and to operate a fraud or deceit upon another person.

(v)     Petit made, certified, or approved the false and material statements

and omissions in the SEC Form 10-Q filed May 12, 2014[92] and SEC

---

[88] See **Exhibit JJ** and Appendix 1 at Row 7
[89] See **Exhibit KK** and Appendix 1 at Row 6
[90] See **Exhibit W** and Appendix 1 at Row 9
[91] See **Exhibit LL** and Appendix 1 at Row 8
[92] See **Exhibit MM** and Appendix 1 at Row 11

Form 8-K dated April 7, 2014[93] issued for the first quarter of 2014, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Petit knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(vi)   Petit made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed August 11, 2014[94] and SEC Form 8-K dated July 28, 2014[95] issued for the second quarter of 2014, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Petit knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(vii)  Petit made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed November 11, 2014[96] and SEC Form 8-K dated October 30, 2014[97] issued for the third quarter of

---

[93] See **Exhibit NN** and Appendix 1 at Row 10
[94] See **Exhibit OO** and Appendix 1 at Row 13
[95] See **Exhibit PP** and Appendix 1 at Row 12
[96] See **Exhibit QQ** and Appendix 1 at Row 15
[97] See **Exhibit RR** and Appendix 1 at Row 14

2014, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices. Petit knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(viii)   Petit made, certified, or approved the false and material statements and omissions in the SEC Form 10-K filed March 13, 2015[98] and SEC Form 8-K dated February 26, 2015[99] issued for the fourth quarter and full year 2014, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices. Petit knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(ix)   Petit made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed May 1, 2015[100] and SEC Form 8-K dated April 13, 2015[101] issued for the first quarter of 2015, including those statements and omissions regarding MiMedx's sales,

---

[98] See **Exhibit X** and Appendix 1 at Row 17
[99] See **Exhibit SS** and Appendix 1 at Row 16
[100] See **Exhibit TT** and Appendix 1 at Row 19
[101] See **Exhibit UU** and Appendix 1 at Row 18

revenues, and fraudulent revenue recognition practices.  Petit knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(x)    Petit made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed August 7, 2015[102] and SEC Form 8-K dated July 30, 2015[103] issued for the second quarter of 2015, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Petit knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xi)    Petit made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q November 6, 2015[104] and SEC Form 8-K dated October 29, 2015[105] issued for the third quarter of 2015, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Petit

---

[102] See **Exhibit VV** and Appendix 1 at Row 21
[103] See **Exhibit WW** and Appendix 1 at Row 20
[104] See **Exhibit XX** and Appendix 1 at Row 23
[105] See **Exhibit YY** and Appendix 1 at Row 22

knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xii)   Petit made, certified, or approved the false and material statements and omissions in the SEC Form 10-K filed February 29, 2016[106] and SEC Form 8-K dated February 23, 2016[107] issued for the fourth quarter and full year 2015, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Petit knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xiii)  Petit made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed May 10, 2016[108] and SEC Form 8-K dated April 26, 2016[109] issued for the first quarter of 2016, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Petit

---

[106] See **Exhibit Y** and Appendix 1 at Row 25
[107] See **Exhibit ZZ** and Appendix 1 at Row 24
[108] See **Exhibit AAA** and Appendix 1 at Row 27
[109] See **Exhibit BBB** and Appendix 1 at Row 26

knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xiv) Petit made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed August 2, 2016[110] and SEC Form 8-K dated July 26, 2016[111] issued for the second quarter of 2016, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Petit knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[112]

(xv) Petit made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed November 8, 2016[113] issued for the third quarter of 2016, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Petit knowingly and willfully made or approved these false statements with the specific intent to defraud or

---

[110] See **Exhibit CCC** and Appendix 1 at Row 29
[111] See **Exhibit DDD** and Appendix 1 at Row 28
[112] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website.
[113] See **Exhibit EEE** and Appendix 1 at Row 30

deceive the investing public and to operate a fraud or deceit upon another person.[114]

(xvi) Petit made, certified, or approved the false and material statements and omissions in the false and material statements and omissions in the SEC Form 10-K filed March 1, 2017[115] issued for the fourth quarter and full year 2016, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Petit knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[116]

(xvii) Petit made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed May 1, 2017[117] issued for the first quarter of 2017, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Petit knowingly and willfully made or approved these false statements with the specific intent to defraud or

---

[114] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website
[115] See **Exhibit Z** and Appendix 1 at Row 30
[116] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website
[117] See **Exhibit FFF** and Appendix 1 at Row 32

deceive the investing public and to operate a fraud or deceit upon another person.[118]

(xviii) Petit made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed July 31, 2017[119] issued for the second quarter of 2017, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Petit knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[120]

(xix) Petit made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed October 31, 2017[121] issued for the third quarter of 2017, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Petit knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon

---

[118] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website.
[119] See **Exhibit GGG** and Appendix 1 at Row 33
[120] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website.
[121] See **Exhibit HHH** and Appendix 1 at Row 34

another person.[122]

(xx)    Petit made, certified, or approved the false and material statements and omissions in the false February 20, 2018 statement that the outcome of MiMedx's internal investigation into its sales, distribution, and accounting practices "should not have a material impact on revenue guidance for 2018."[123]  Petit knowingly and willfully made this false statement with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xxi)   Petit made or approved the false and material statements and omissions in the SEC Form 8-K dated March 15, 2018[124] that MiMedx had a "confident … expectation that we will exceed $92 million in revenue for the first quarter of 2018."  Petit knowingly and willfully made this false statement with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xxii)  Petit made or approved the false and material statements and omissions in the SEC Form 8-K dated April 26, 2018[125] that "first

---

[122] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website.
[123] *See* **Exhibit A**
[124] *See* **Exhibit B**
[125] *See* **Exhibit T** and Appendix at Row 35

quarter of [2018] revenue growth is a clear demonstration of the strength of our product lines, our sales management system and talent we have assembled in our sales and other key functions within our organization.  Based upon our strong first quarter performance, we have raised our full year revenue guidance from a previous range of $383 million to $387 million to a revised range of $389 million to $394 million."  Petit knowingly and willfully made this false statement with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xxiii) Petit was convicted of securities fraud in November 2020 in connection with many of the statements identified herein.

205.

Taylor (1) employed a device, scheme, or artifice to defraud, made material statements and omissions, and engaged in an act, practice, or course of business that operated as a fraud or deceit upon another person, and (2) knowingly and willfully made untrue statements of material fact to the investing public through official filings with the specific intent to defraud or deceive.  Such acts include:

(i)    Taylor made or approved the false and material statements and omissions in the SEC Form 10-Q filed May 19, 2013[126] and SEC

---

[126] See **Exhibit EE** and Appendix 1 at Row 2

Form 8-K dated May 1, 2013[127] issued for the first quarter of 2013, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Taylor knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(ii)     Taylor made or approved the false and material statements and omissions in the SEC Form 10-Q August 8, 2013[128] and two SEC Form 8-Ks dated July 19 & 31, 2013[129] issued for the second quarter of 2013, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Taylor knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(iii)    Taylor made or approved the false and material statements and omissions in the SEC Form 10-Q filed November 8, 2013[130] and SEC Form 8-K dated October 30, 2013[131] issued for the third quarter of

---

[127] See **Exhibit FF** and Appendix 1 at Row 1
[128] See **Exhibit GG** and Appendix 1 at Row 5
[129] See **Exhibits HH**, **II** and Appendix 1 at Rows 3, 4
[130] See **Exhibit JJ** and Appendix 1 at Row 7
[131] See **Exhibit KK** and Appendix 1 at Row 6

2013, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Taylor knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(iv)  Taylor made or approved the false and material statements and omissions in the SEC Form 10-K filed March 4, 2014[132] and SEC Form 8-K dated February 26, 2013[133] issued for the fourth quarter and full year 2013, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Taylor knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(v)  Taylor made or approved the false and material statements and omissions in the SEC Form 10-Q filed May 12, 2014[134] and SEC Form 8-K dated April 7, 2014[135] issued for the first quarter of 2014, including those statements and omissions regarding MiMedx's sales,

---

[132]  See **Exhibit W** and Appendix 1 at Row 9
[133]  See **Exhibit LL** and Appendix 1 at Row 8
[134]  See **Exhibit MM** and Appendix 1 at Row 11
[135]  See **Exhibit NN** and Appendix 1 at Row 10

revenues, and fraudulent revenue recognition practices.  Taylor knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(vi)   Taylor made or approved the false and material statements and omissions in the SEC Form 10-Q filed August 11, 2014[136] and SEC Form 8-K dated July 28, 2014[137] issued for the second quarter of 2014, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Taylor knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(vii)   Taylor made or approved the false and material statements and omissions in the SEC Form 10-Q filed November 11, 2014[138] and SEC Form 8-K dated October 30, 2014[139] issued for the third quarter of 2014, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition

---

[136] See **Exhibit OO** and Appendix 1 at Row 13
[137] See **Exhibit PP** and Appendix 1 at Row 12
[138] See **Exhibit QQ** and Appendix 1 at Row 15
[139] See **Exhibit RR** and Appendix 1 at Row 14

practices.  Taylor knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(viii)  Taylor made or approved the false and material statements and omissions in the SEC Form 10-K filed March 13, 2015[140] and SEC Form 8-K dated February 26, 2015[141] issued for the fourth quarter and full year 2014, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Taylor knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(ix)  Taylor made or approved the false and material statements and omissions in the SEC Form 10-Q filed May 1, 2015[142] and SEC Form 8-K dated April 13, 2015[143] issued for the first quarter of 2015, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Taylor knowingly and willfully made or approved these false statements with

---

[140] See **Exhibit X** and Appendix 1 at Row 17
[141] See **Exhibit SS** and Appendix 1 at Row 16
[142] See **Exhibit TT** and Appendix 1 at Row 19
[143] See **Exhibit UU** and Appendix 1 at Row 18

the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(x)    Taylor made or approved the false and material statements and omissions in the SEC Form 10-Q filed August 7, 2015[144] and SEC Form 8-K dated July 30, 2015[145] issued for the second quarter of 2015, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Taylor knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xi)    Taylor made or approved the false and material statements and omissions in the SEC Form 10-Q November 6, 2015[146] and SEC Form 8-K dated October 29, 2015[147] issued for the third quarter of 2015, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Taylor knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to

---

[144] See **Exhibit VV** and Appendix 1 at Row 21
[145] See **Exhibit WW** and Appendix 1 at Row 20
[146] See **Exhibit XX** and Appendix 1 at Row 23
[147] See **Exhibit YY** and Appendix 1 at Row 22

operate a fraud or deceit upon another person.

(xii)   Taylor made or approved the false and material statements and omissions in the SEC Form 10-K filed February 29, 2016[148] and SEC Form 8-K dated February 23, 2016[149] issued for the fourth quarter and full year 2015, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices. Taylor knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xiii)   Taylor made or approved the false and material statements and omissions in the SEC Form 10-Q filed May 10, 2016[150] and SEC Form 8-K dated April 26, 2016[151] issued for the first quarter of 2016, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices. Taylor knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

---

[148] See **Exhibit Y** and Appendix 1 at Row 25
[149] See **Exhibit ZZ** and Appendix 1 at Row 24
[150] See **Exhibit AAA** and Appendix 1 at Row 27
[151] See **Exhibit BBB** and Appendix 1 at Row 26

(xiv) Taylor made or approved the false and material statements and omissions in the SEC Form 10-Q filed August 2, 2016[152] and SEC Form 8-K dated July 26, 2016[153] issued for the second quarter of 2016, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Taylor knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[154]

(xv) Taylor made or approved the false and material statements and omissions in the SEC Form 10-Q filed November 8, 2016[155] issued for the third quarter of 2016, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Taylor knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[156]

---

[152] See **Exhibit CCC** and Appendix 1 at Row 29
[153] See **Exhibit DDD** and Appendix 1 at Row 28
[154] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website.
[155] See **Exhibit EEE** and Appendix 1 at Row 30
[156] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website

(xvi) Taylor made or approved the false and material statements and omissions in the false and material statements and omissions in the SEC Form 10-K filed March 1, 2017[157] issued for the fourth quarter and full year 2016, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Taylor knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[158]

(xvii) Taylor made or approved the false and material statements and omissions in the SEC Form 10-Q filed May 1, 2017[159] issued for the first quarter of 2017, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Taylor knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[160]

---

[157] See **Exhibit Z** and Appendix 1 at Row 31
[158] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website
[159] See **Exhibit FFF** and Appendix 1 at Row 32
[160] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website.

(xviii) Taylor made or approved the false and material statements and omissions in the SEC Form 10-Q filed July 31, 2017[161] issued for the second quarter of 2017, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Taylor knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[162]

(xix) Taylor made or approved the false and material statements and omissions in the SEC Form 10-Q filed October 31, 2017[163] issued for the third quarter of 2017, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Taylor knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[164]

(xx) Taylor made or approved the false and material statements and

---

[161] See **Exhibit GGG** and Appendix 1 at Row 33
[162] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website.
[163] See **Exhibit HHH** and Appendix 1 at Row 34
[164] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website.

omissions in the false February 20, 2018 statement that the outcome of MiMedx's internal investigation into its sales, distribution, and accounting practices "should not have a material impact on revenue guidance for 2018."[165]  Taylor knowingly and willfully made this false statement with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xxi)   Taylor made or approved the false and material statements and omissions in the SEC Form 8-K dated March 15, 2018[166] that MiMedx had a "confident … expectation that we will exceed $92 million in revenue for the first quarter of 2018."  Taylor knowingly and willfully made this false statement with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xxii)  Taylor made or approved the false and material statements and omissions in the SEC Form 8-K dated April 26, 2018[167] that "first quarter of [2018] revenue growth is a clear demonstration of the strength of our product lines, our sales management system and talent we have assembled in our sales and other key functions within our

---

[165] *See* **Exhibit A**
[166] *See* **Exhibit B**
[167] *See* **Exhibit T** and Appendix at Row 35

organization.  Based upon our strong first quarter performance, we

have raised our full year revenue guidance from a previous range of

$383 million to $387 million to a revised range of $389 million to

$394 million."  Taylor knowingly and willfully made this false

statement with the specific intent to defraud or deceive the investing

public and to operate a fraud or deceit upon another person."

(xxiii) Taylor was convicted of conspiracy to commit securities fraud in

November 2020 in connection with many of the false statements

identified herein.

206.

Senken (1) employed a device, scheme, or artifice to defraud, made material

statements and omissions, and engaged in an act, practice, or course of business

that operated as a fraud or deceit upon another person, and (2) knowingly and

willfully made untrue statements of material fact to the investing public through

official filings with the specific intent to defraud or deceive.  Such acts include:

(i)     Senken made, certified, or approved the false and material statements

and omissions in the SEC Form 10-Q filed May 19, 2013[168] and SEC

Form 8-K dated May 1, 2013[169] issued for the first quarter of 2013,

---

[168] See **Exhibit EE** and Appendix 1 at Row 2
[169] See **Exhibit FF** and Appendix 1 at Row 1

including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Senken knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(ii)     Senken made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q August 8, 2013[170] and two SEC Form 8-Ks dated July 19 & 31, 2013[171] issued for the second quarter of 2013, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Senken knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(iii)    Senken made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed November 8, 2013[172] and SEC Form 8-K dated October 30, 2013[173] issued for the third quarter of 2013, including those statements and omissions regarding

---

[170] See **Exhibit GG** and Appendix 1 at Row 5
[171] See **Exhibits HH**, **II** and Appendix 1 at Rows 3, 4
[172] See **Exhibit JJ** and Appendix 1 at Row 7
[173] See **Exhibit KK** and Appendix 1 at Row 6

MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Senken knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(iv)    Senken made, certified, or approved the false and material statements and omissions in the SEC Form 10-K filed March 4, 2014[174] and SEC Form 8-K dated February 26, 2013[175] issued for the fourth quarter and full year 2013, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Senken knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(v)    Senken made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed May 12, 2014[176] and SEC Form 8-K dated April 7, 2014[177] issued for the first quarter of 2014, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Senken

---

[174]  See **Exhibit W** and Appendix 1 at Row 9
[175]  See **Exhibit LL** and Appendix 1 at Row 8
[176]  See **Exhibit MM** and Appendix 1 at Row 11
[177]  See **Exhibit NN** and Appendix 1 at Row 10

knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(vi)     Senken made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed August 11, 2014[178] and SEC Form 8-K dated July 28, 2014[179] issued for the second quarter of 2014, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Senken knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(vii)    Senken made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed November 11, 2014[180] and SEC Form 8-K dated October 30, 2014[181] issued for the third quarter of 2014, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Senken knowingly and willfully made or approved these

---

[178] See **Exhibit OO** and Appendix 1 at Row 13
[179] See **Exhibit PP** and Appendix 1 at Row 12
[180] See **Exhibit QQ** and Appendix 1 at Row 15
[181] See **Exhibit RR** and Appendix 1 at Row 14

81

false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(viii)   Senken made, certified, or approved the false and material statements and omissions in the SEC Form 10-K filed March 13, 2015[182] and SEC Form 8-K dated February 26, 2015[183] issued for the fourth quarter and full year 2014, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Senken knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(ix)   Senken made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed May 1, 2015[184] and SEC Form 8-K dated April 13, 2015[185] issued for the first quarter of 2015, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Senken knowingly and willfully made or approved these false statements with

---

[182] See **Exhibit X** and Appendix 1 at Row 17
[183] See **Exhibit SS** and Appendix 1 at Row 16
[184] See **Exhibit TT** and Appendix 1 at Row 19
[185] See **Exhibit UU** and Appendix 1 at Row 18

the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(x)     Senken made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed August 7, 2015[186] and SEC Form 8-K dated July 30, 2015[187] issued for the second quarter of 2015, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Senken knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xi)    Senken made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q November 6, 2015[188] and SEC Form 8-K dated October 29, 2015[189] issued for the third quarter of 2015, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Senken knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to

---

[186] See **Exhibit VV** and Appendix 1 at Row 21
[187] See **Exhibit WW** and Appendix 1 at Row 20
[188] See **Exhibit XX** and Appendix 1 at Row 23
[189] See **Exhibit YY** and Appendix 1 at Row 22

operate a fraud or deceit upon another person.

(xii)   Senken made, certified, or approved the false and material statements and omissions in the SEC Form 10-K filed February 29, 2016[190] and SEC Form 8-K dated February 23, 2016[191] issued for the fourth quarter and full year 2015, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Senken knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xiii)  Senken made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed May 10, 2016[192] and SEC Form 8-K dated April 26, 2016[193] issued for the first quarter of 2016, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Senken knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to

---

[190] See **Exhibit Y** and Appendix 1 at Row 25
[191] See **Exhibit ZZ** and Appendix 1 at Row 24
[192] See **Exhibit AAA** and Appendix 1 at Row 27
[193] See **Exhibit BBB** and Appendix 1 at Row 26

operate a fraud or deceit upon another person.

(xiv)   Senken made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed August 2, 2016[194] and SEC Form 8-K dated July 26, 2016[195] issued for the second quarter of 2016, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Senken knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[196]

(xv)    Senken made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed November 8, 2016[197] issued for the third quarter of 2016, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Senken knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon

---

[194] See **Exhibit CCC** and Appendix 1 at Row 29
[195] See **Exhibit DDD** and Appendix 1 at Row 28
[196] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website.
[197] See **Exhibit EEE** and Appendix 1 at Row 30

another person.[198]

(xvi)   Senken made, certified, or approved the false and material statements and omissions in the false and material statements and omissions in the SEC Form 10-K filed March 1, 2017[199] issued for the fourth quarter and full year 2016, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Senken knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[200]

(xvii)  Senken made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed May 1, 2017[201] issued for the first quarter of 2017, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Senken knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon

---

[198] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website
[199] See **Exhibit Z** and Appendix 1 at Row 30
[200] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website
[201] See **Exhibit FFF** and Appendix 1 at Row 32

another person.[202]

(xviii) Senken made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed July 31, 2017[203] issued for the second quarter of 2017, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Senken knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[204]

(xix) Senken made, certified, or approved the false and material statements and omissions in the SEC Form 10-Q filed October 31, 2017[205] issued for the third quarter of 2017, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Senken knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon

---

[202] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website.
[203] See **Exhibit GGG** and Appendix 1 at Row 33
[204] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website.
[205] See **Exhibit HHH** and Appendix 1 at Row 34

another person.[206]

(xx)    Senken made, certified, or approved the false and material statements
and omissions in the false February 20, 2018 statement that the
outcome of MiMedx's internal investigation into its sales, distribution,
and accounting practices "should not have a material impact on
revenue guidance for 2018."[207]  Senken knowingly and willfully made
this false statement with the specific intent to defraud or deceive the
investing public and to operate a fraud or deceit upon another person.

(xxi)   Senken made or approved the false and material statements and
omissions in the SEC Form 8-K dated March 15, 2018[208] that
MiMedx had a "confident … expectation that we will exceed $92
million in revenue for the first quarter of 2018."  Senken knowingly
and willfully made this false statement with the specific intent to
defraud or deceive the investing public and to operate a fraud or deceit
upon another person.

(xxii)  Senken made or approved the false and material statements and
omissions in the SEC Form 8-K dated April 26, 2018[209] that "first

---

[206] The Company also issued a fraudulent press release in connection with its sales and revenues
for this reporting period, but the Company has since removed the press release from its website.
[207] *See* **Exhibit A**
[208] *See* **Exhibit B**
[209] *See* **Exhibit T** and Appendix at Row 35

quarter of [2018] revenue growth is a clear demonstration of the strength of our product lines, our sales management system and talent we have assembled in our sales and other key functions within our organization.  Based upon our strong first quarter performance, we have raised our full year revenue guidance from a previous range of $383 million to $387 million to a revised range of $389 million to $394 million."  Senken knowingly and willfully made this false statement with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person."

207.

Dewberry (1) employed a device, scheme, or artifice to defraud, made material statements and omissions, and engaged in an act, practice, or course of business that operated as a fraud or deceit upon another person, and (2) knowingly and willfully made untrue statements of material fact to the investing public through official filings with the specific intent to defraud or deceive.  Such acts include:

(i)     Dewberry made or approved the false and material statements and omissions in the SEC Form 10-Q filed May 19, 2013[210] and SEC

---

[210] See **Exhibit EE** and Appendix 1 at Row 2

Form 8-K dated May 1, 2013[211] issued for the first quarter of 2013, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices. Dewberry knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(ii)     Dewberry made or approved the false and material statements and omissions in the SEC Form 10-Q August 8, 2013[212] and two SEC Form 8-Ks dated July 19 & 31, 2013[213] issued for the second quarter of 2013, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices. Dewberry knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(iii)    Dewberry made or approved the false and material statements and omissions in the SEC Form 10-Q filed November 8, 2013[214] and SEC Form 8-K dated October 30, 2013[215] issued for the third quarter of

---

[211] See **Exhibit FF** and Appendix 1 at Row 1
[212] See **Exhibit GG** and Appendix 1 at Row 5
[213] See **Exhibits HH**, **II** and Appendix 1 at Rows 3, 4
[214] See **Exhibit JJ** and Appendix 1 at Row 7
[215] See **Exhibit KK** and Appendix 1 at Row 6

2013, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices. Dewberry knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(iv)   Dewberry made or approved the false and material statements and omissions in the SEC Form 10-K filed March 4, 2014[216] and SEC Form 8-K dated February 26, 2013[217] issued for the fourth quarter and full year 2013, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Dewberry knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(v)   Dewberry made or approved the false and material statements and omissions in the SEC Form 10-Q filed May 12, 2014[218] and SEC Form 8-K dated April 7, 2014[219] issued for the first quarter of 2014, including those statements and omissions regarding MiMedx's sales,

---

[216]  See **Exhibit W** and Appendix 1 at Row 9
[217]  See **Exhibit LL** and Appendix 1 at Row 8
[218] See **Exhibit MM** and Appendix 1 at Row 11
[219] See **Exhibit NN** and Appendix 1 at Row 10

revenues, and fraudulent revenue recognition practices.  Dewberry knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(vi)     Dewberry made or approved the false and material statements and omissions in the SEC Form 10-Q filed August 11, 2014[220] and SEC Form 8-K dated July 28, 2014[221] issued for the second quarter of 2014, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices. Dewberry knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(vii)    Dewberry made or approved the false and material statements and omissions in the SEC Form 10-Q filed November 11, 2014[222] and SEC Form 8-K dated October 30, 2014[223] issued for the third quarter of 2014, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition

---

[220] See **Exhibit OO** and Appendix 1 at Row 13
[221] See **Exhibit PP** and Appendix 1 at Row 12
[222] See **Exhibit QQ** and Appendix 1 at Row 15
[223] See **Exhibit RR** and Appendix 1 at Row 14

practices.  Dewberry knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(viii)  Dewberry made or approved the false and material statements and omissions in the SEC Form 10-K filed March 13, 2015[224] and SEC Form 8-K dated February 26, 2015[225] issued for the fourth quarter and full year 2014, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Dewberry knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(ix)  Dewberry made or approved the false and material statements and omissions in the SEC Form 10-Q filed May 1, 2015[226] and SEC Form 8-K dated April 13, 2015[227] issued for the first quarter of 2015, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Dewberry knowingly and willfully made or approved these false statements with

---

[224] See **Exhibit X** and Appendix 1 at Row 17
[225] See **Exhibit SS** and Appendix 1 at Row 16
[226] See **Exhibit TT** and Appendix 1 at Row 19
[227] See **Exhibit UU** and Appendix 1 at Row 18

the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(x)     Dewberry made or approved the false and material statements and omissions in the SEC Form 10-Q filed August 7, 2015[228] and SEC Form 8-K dated July 30, 2015[229] issued for the second quarter of 2015, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices. Dewberry knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xi)    Dewberry made or approved the false and material statements and omissions in the SEC Form 10-Q November 6, 2015[230] and SEC Form 8-K dated October 29, 2015[231] issued for the third quarter of 2015, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices. Dewberry knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to

---

[228] See **Exhibit VV** and Appendix 1 at Row 21
[229] See **Exhibit WW** and Appendix 1 at Row 20
[230] See **Exhibit XX** and Appendix 1 at Row 23
[231] See **Exhibit YY** and Appendix 1 at Row 22

operate a fraud or deceit upon another person.

(xii)   Dewberry made or approved the false and material statements and omissions in the SEC Form 10-K filed February 29, 2016[232] and SEC Form 8-K dated February 23, 2016[233] issued for the fourth quarter and full year 2015, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Dewberry knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xiii)  Dewberry made or approved the false and material statements and omissions in the SEC Form 10-Q filed May 10, 2016[234] and SEC Form 8-K dated April 26, 2016[235] issued for the first quarter of 2016, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Dewberry knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

---

[232] See **Exhibit Y** and Appendix 1 at Row 25
[233] See **Exhibit ZZ** and Appendix 1 at Row 24
[234] See **Exhibit AAA** and Appendix 1 at Row 27
[235] See **Exhibit BBB** and Appendix 1 at Row 26

(xiv)   Dewberry made or approved the false and material statements and omissions in the SEC Form 10-Q filed August 2, 2016[236] and SEC Form 8-K dated July 26, 2016[237] issued for the second quarter of 2016, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices. Dewberry knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[238]

(xv)   Dewberry made or approved the false and material statements and omissions in the SEC Form 10-Q filed November 8, 2016[239] issued for the third quarter of 2016, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices. Dewberry knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[240]

---

[236] See **Exhibit CCC** and Appendix 1 at Row 29
[237] See **Exhibit DDD** and Appendix 1 at Row 28
[238] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website.
[239] See **Exhibit EEE** and Appendix 1 at Row 30
[240] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website

(xvi) Dewberry made or approved the false and material statements and omissions in the false and material statements and omissions in the SEC Form 10-K filed March 1, 2017[241] issued for the fourth quarter and full year 2016, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Dewberry knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[242]

(xvii) Dewberry made or approved the false and material statements and omissions in the SEC Form 10-Q filed May 1, 2017[243] issued for the first quarter of 2017, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Dewberry knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[244]

---

[241] See **Exhibit Z** and Appendix 1 at Row 30
[242] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website
[243] See **Exhibit FFF** and Appendix 1 at Row 32
[244] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website.

(xviii) Dewberry made or approved the false and material statements and omissions in the SEC Form 10-Q filed July 31, 2017[245] issued for the second quarter of 2017, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Dewberry knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[246]

(xix) Dewberry made or approved the false and material statements and omissions in the SEC Form 10-Q filed October 31, 2017[247] issued for the third quarter of 2017, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Dewberry knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[248]

(xx) Dewberry made or approved the false and material statements and

---

[245] See **Exhibit GGG** and Appendix 1 at Row 33
[246] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website.
[247] See **Exhibit HHH** and Appendix 1 at Row 34
[248] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website.

omissions in the false February 20, 2018 statement that the outcome of MiMedx's internal investigation into its sales, distribution, and accounting practices "should not have a material impact on revenue guidance for 2018."[249]  Dewberry knowingly and willfully made this false statement with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xxi)    Dewberry made or approved the false and material statements and omissions in the SEC Form 8-K dated March 15, 2018[250] that MiMedx had a "confident … expectation that we will exceed $92 million in revenue for the first quarter of 2018."  Dewberry knowingly and willfully made this false statement with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xxii)   Dewberry made or approved the false and material statements and omissions in the SEC Form 8-K dated April 26, 2018[251] that "first quarter of [2018] revenue growth is a clear demonstration of the strength of our product lines, our sales management system and talent we have assembled in our sales and other key functions within our

---

[249] *See* **Exhibit A**
[250] *See* **Exhibit B**
[251] *See* **Exhibit T** and Appendix at Row 35

organization.  Based upon our strong first quarter performance, we have raised our full year revenue guidance from a previous range of $383 million to $387 million to a revised range of $389 million to $394 million."  Dewberry knowingly and willfully made this false statement with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

208.

Evans (1) employed a device, scheme, or artifice to defraud, made material statements and omissions, and engaged in an act, practice, or course of business that operated as a fraud or deceit upon another person, and (2) knowingly and willfully made untrue statements of material fact to the investing public through official filings with the specific intent to defraud or deceive.  Such acts include:

(i)     Evans made or approved the false and material statements and omissions in the SEC Form 10-Q filed May 19, 2013[252] and SEC Form 8-K dated May 1, 2013[253] issued for the first quarter of 2013, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Evans knowingly and willfully made or approved these false statements with

---

[252] See **Exhibit EE** and Appendix 1 at Row 2
[253] See **Exhibit FF** and Appendix 1 at Row 1

the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(ii)   Evans made or approved the false and material statements and omissions in the SEC Form 10-Q August 8, 2013[254] and two SEC Form 8-Ks dated July 19 & 31, 2013[255] issued for the second quarter of 2013, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Evans knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(iii)   Evans made or approved the false and material statements and omissions in the SEC Form 10-Q filed November 8, 2013[256] and SEC Form 8-K dated October 30, 2013[257] issued for the third quarter of 2013, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Evans knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to

---

[254] See **Exhibit GG** and Appendix 1 at Row 5
[255] See **Exhibits HH**, **II** and Appendix 1 at Rows 3, 4
[256] See **Exhibit JJ** and Appendix 1 at Row 7
[257] See **Exhibit KK** and Appendix 1 at Row 6

operate a fraud or deceit upon another person.

(iv)   Evans made or approved the false and material statements and omissions in the SEC Form 10-K filed March 4, 2014[258] and SEC Form 8-K dated February 26, 2013[259] issued for the fourth quarter and full year 2013, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Evans knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(v)   Evans made or approved the false and material statements and omissions in the SEC Form 10-Q filed May 12, 2014[260] and SEC Form 8-K dated April 7, 2014[261] issued for the first quarter of 2014, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Evans knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

---

[258]  See **Exhibit W** and Appendix 1 at Row 9
[259]  See **Exhibit LL** and Appendix 1 at Row 8
[260]  See **Exhibit MM** and Appendix 1 at Row 11
[261]  See **Exhibit NN** and Appendix 1 at Row 10

(vi)     Evans made or approved the false and material statements and

omissions in the SEC Form 10-Q filed August 11, 2014[262] and SEC

Form 8-K dated July 28, 2014[263] issued for the second quarter of

2014, including those statements and omissions regarding MiMedx's

sales, revenues, and fraudulent revenue recognition practices.  Evans

knowingly and willfully made or approved these false statements with

the specific intent to defraud or deceive the investing public and to

operate a fraud or deceit upon another person.

(vii)    Evans made or approved the false and material statements and

omissions in the SEC Form 10-Q filed November 11, 2014[264] and

SEC Form 8-K dated October 30, 2014[265] issued for the third quarter

of 2014, including those statements and omissions regarding

MiMedx's sales, revenues, and fraudulent revenue recognition

practices.  Evans knowingly and willfully made or approved these

false statements with the specific intent to defraud or deceive the

investing public and to operate a fraud or deceit upon another person.

(viii)   Evans made or approved the false and material statements and

---

[262] See **Exhibit OO** and Appendix 1 at Row 13
[263] See **Exhibit PP** and Appendix 1 at Row 12
[264] See **Exhibit QQ** and Appendix 1 at Row 15
[265] See **Exhibit RR** and Appendix 1 at Row 14

omissions in the SEC Form 10-K filed March 13, 2015[266] and SEC Form 8-K dated February 26, 2015[267] issued for the fourth quarter and full year 2014, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Evans knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(ix)     Evans made or approved the false and material statements and omissions in the SEC Form 10-Q filed May 1, 2015[268] and SEC Form 8-K dated April 13, 2015[269] issued for the first quarter of 2015, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Evans knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(x)      Evans made or approved the false and material statements and omissions in the SEC Form 10-Q filed August 7, 2015[270] and SEC

---

[266] See **Exhibit X** and Appendix 1 at Row 17
[267] See **Exhibit SS** and Appendix 1 at Row 16
[268] See **Exhibit TT** and Appendix 1 at Row 19
[269] See **Exhibit UU** and Appendix 1 at Row 18
[270] See **Exhibit VV** and Appendix 1 at Row 21

Form 8-K dated July 30, 2015[271] issued for the second quarter of 2015, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Evans knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xi)    Evans made or approved the false and material statements and omissions in the SEC Form 10-Q November 6, 2015[272] and SEC Form 8-K dated October 29, 2015[273] issued for the third quarter of 2015, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Evans knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xii)   Evans made or approved the false and material statements and omissions in the SEC Form 10-K filed February 29, 2016[274] and SEC Form 8-K dated February 23, 2016[275] issued for the fourth quarter and

---

[271] See **Exhibit WW** and Appendix 1 at Row 20
[272] See **Exhibit XX** and Appendix 1 at Row 23
[273] See **Exhibit YY** and Appendix 1 at Row 22
[274] See **Exhibit Y** and Appendix 1 at Row 25
[275] See **Exhibit ZZ** and Appendix 1 at Row 24

full year 2015, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices. Evans knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xiii) Evans made or approved the false and material statements and omissions in the SEC Form 10-Q filed May 10, 2016[276] and SEC Form 8-K dated April 26, 2016[277] issued for the first quarter of 2016, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices. Evans knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xiv) Evans made or approved the false and material statements and omissions in the SEC Form 10-Q filed August 2, 2016[278] and SEC Form 8-K dated July 26, 2016[279] issued for the second quarter of 2016, including those statements and omissions regarding MiMedx's

---

[276] See **Exhibit AAA** and Appendix 1 at Row 27
[277] See **Exhibit BBB** and Appendix 1 at Row 26
[278] See **Exhibit CCC** and Appendix 1 at Row 29
[279] See **Exhibit DDD** and Appendix 1 at Row 28

sales, revenues, and fraudulent revenue recognition practices.  Evans knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[280]

(xv)   Evans made or approved the false and material statements and omissions in the SEC Form 10-Q filed November 8, 2016[281] issued for the third quarter of 2016, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Evans knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[282]

(xvi)   Evans made or approved the false and material statements and omissions in the false and material statements and omissions in the SEC Form 10-K filed March 1, 2017[283] issued for the fourth quarter and full year 2016, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue

---

[280] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website.
[281] See **Exhibit EEE** and Appendix 1 at Row 30
[282] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website
[283] See **Exhibit Z** and Appendix 1 at Row 30

recognition practices.  Evans knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[284]

(xvii) Evans made or approved the false and material statements and omissions in the SEC Form 10-Q filed May 1, 2017[285] issued for the first quarter of 2017, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Evans knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[286]

(xviii) Evans made or approved the false and material statements and omissions in the SEC Form 10-Q filed July 31, 2017[287] issued for the second quarter of 2017, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Evans knowingly and willfully made or

---

[284] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website
[285] See **Exhibit FFF** and Appendix 1 at Row 32
[286] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website.
[287] See **Exhibit GGG** and Appendix 1 at Row 33

approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[288]

(xix)  Evans made or approved the false and material statements and omissions in the SEC Form 10-Q filed October 31, 2017[289] issued for the third quarter of 2017, including those statements and omissions regarding MiMedx's sales, revenues, and fraudulent revenue recognition practices.  Evans knowingly and willfully made or approved these false statements with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.[290]

(xx)   Evans made or approved the false and material statements and omissions in the false February 20, 2018 statement that the outcome of MiMedx's internal investigation into its sales, distribution, and accounting practices "should not have a material impact on revenue guidance for 2018."[291]  Evans knowingly and willfully made this false statement with the specific intent to defraud or deceive the investing

---

[288] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website.
[289] See **Exhibit HHH** and Appendix 1 at Row 34
[290] The Company also issued a fraudulent press release in connection with its sales and revenues for this reporting period, but the Company has since removed the press release from its website.
[291] *See* **Exhibit A**

public and to operate a fraud or deceit upon another person.

(xxi)  Evans made or approved the false and material statements and omissions in the SEC Form 8-K dated March 15, 2018[292] that MiMedx had a "confident … expectation that we will exceed $92 million in revenue for the first quarter of 2018."  Evans knowingly and willfully made this false statement with the specific intent to defraud or deceive the investing public and to operate a fraud or deceit upon another person.

(xxii)  Evans made or approved the false and material statements and omissions in the SEC Form 8-K dated April 26, 2018[293] that "first quarter of [2018] revenue growth is a clear demonstration of the strength of our product lines, our sales management system and talent we have assembled in our sales and other key functions within our organization.  Based upon our strong first quarter performance, we have raised our full year revenue guidance from a previous range of $383 million to $387 million to a revised range of $389 million to $394 million."  Evans knowingly and willfully made this false statement with the specific intent to defraud or deceive the investing

---

[292] *See* **Exhibit B**
[293] *See* **Exhibit T** and Appendix at Row 35

public and to operate a fraud or deceit upon another person.

209.

MiMedx knowingly and willingly ratified and issued the fraudulent, material misrepresentations and omissions false statements described herein, including those detailed in paragraphs 184-188.

210.

At the time of each fraudulent, material misrepresentation and omission, each Defendant possessed direct information about MiMedx's illicit sales and distribution practices, including side arrangements with distributors, bribery of distributors, channel stuffing, improper revenue recognition and other improper conduct, and knew the truth surrounding MiMedx's inflated financial results.  As such, each Defendant knew and intended that materially false and misleading information was and would be disseminated to the investing public, including Plaintiffs.

211.

Defendants contingent compensation, bonuses and stock and stock options awards, were tied to MiMedx's performance.  Accordingly, the Defendants' compensation structure incentivized, and is evidence supporting the existence of, their fraud.

212.

The Individual Defendants aided and abetted each other's dissemination of false, misleading, and incomplete statements and material omissions.

213.

The investing public, including Plaintiffs, reasonably relied upon the Individual Defendants' false, misleading, and incomplete statements. Plaintiffs actually read and relied upon Defendants materially false statements in making decisions whether to purchase, hold, sell, or exercise their MiMedx call options.

### *Acts of Racketeering Activity – Wire and Mail Fraud*

214.

Defendants predicate acts of racketeering activity also included, but were not necessarily limited to, committing, attempting to commit, and/or soliciting, coercing, or intimidating another person to commit wire fraud in violation of 18 U.S.C. § 1343, a predicate act under O.C.G.A. § 16-14-3(5)(C).

215.

Each Defendant committed two or more acts of wire fraud by:

(i)     making use of telephone calls and other electronic communications, including email, to disseminate the false statements, in furtherance of their fraudulent scheme to mislead the investing public, including Plaintiffs. The false statements disseminated through such means include, but are not limited to, the statements made in SEC filings in

violation of federal and Georgia securities law (*see* ¶¶ 184-188), as well as statements made in press releases and earnings calls that repeated the same false, misleading, and incomplete information regarding MiMedx financial performance as those found in MiMedx's SEC filings with the SEC;

(ii)     making use of telephone calls and other electronic communications, including email, to solicit, coerce, and intimidate others to participate in, and execute, the fraudulent scheme to mislead the investing public, including Plaintiffs; and

(iii)    using the electronic banking systems to send and receive the ill-gotten gains of Defendants' fraudulent scheme to mislead the investing public, including Plaintiffs.

216.

Defendants predicate acts of racketeering activity also included, but were not necessarily limited to, committing, attempting to commit, and/or soliciting, coercing, or intimidating another person to commit mail fraud in violation of 18 U.S.C. § 1341, a predicate act under O.C.G.A. § 16-14-3(5)(C).

217.

Defendants committed mail fraud by causing false statements to be sent in the mail to the investing public, all for the purpose of furthering their fraudulent

scheme to mislead the investing public, including Plaintiffs.

### *Pattern of Racketeering Activity*

218.

Each Defendant's conduct detailed herein constitutes a pattern of racketeering activity.

219.

Each Defendant engaged in a pattern of racketeering activity by performing at least two acts of racketeering activity in furtherance of one or more incidents, schemes, or transactions that have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents, and the last of such acts occurred within four years, excluding any periods of imprisonment, after the commission of a prior act of racketeering activity.   Specifically, Defendants' acts of racketeering activity had:

(i)     The same or similar intents, including to inflate MiMedx's sales, inflate MiMedx's revenue projections, conceal MiMedx's failure to meet revenue guidance, mislead the investing public, and profit from the scheme;

(ii)    The same or similar results, including that MiMedx's sales were inflated, MiMedx's revenue projections were inflated, MiMedx's

failure to meet revenue guidance was concealed, the investing public

was misled, and each Defendant profited;

(iii)   The same or similar victims, including the investing public; and

(iv)   The same or similar methods of commission, including making and

approving public statements to the investing public, regulators, and

auditors that Defendants knew were materially false when the

statements were made.

220.

Defendants' acts of racketeering activity also were interrelated by

distinguishing characteristics and were not isolated incidents.

## COUNT I
## GEORGIA RICO O.C.G.A. § 16-14-4(b)
(Against All Defendants)

221.

Plaintiffs incorporates the allegations in paragraphs 1-220 as if fully set forth

herein.

### *The Enterprise*

222.

Defendants conducted and participated in an association-in-fact enterprise.

The enterprise also included:

(i)   MiMedx employees and directors including Steve Blocker and other

regional and sales managers, General Counsel Haden, and non-Defendant members of the Board of Directors Koseph Bleser, Larry Papasan, Bruce Hack, Charles Koob, and Neil Yeston;

(ii)   Owners and representatives of MiMedx distributors, including Mark Brooks, Brian Martin, and Jerry Morrison;

(iii)   Entities involved with the payment of bribes, kickbacks, or inducements to distributors, including the trust owned and controlled by Petit that funded bribes and the shell company Petit formed into which he deposited bribes.

223.

The enterprise was an ongoing association whose members functioned as a continuing unit for the common purpose of achieving its objectives. The enterprise engaged in activities primarily in Marietta, Georgia.

224.

The objectives of the enterprise included to inflate MiMedx's sales figures, increase the share price of MiMedx, conceal MiMedx's disappointing performance from the investing public, and create financial gain for the enterprise's participants. The members of the enterprise carried out these purposes by using a variety of methods and means, some of which were legal and some of which were illegal.

225.

MiMedx authorized, requested, recklessly tolerated, rewarded, ratified, and benefited from the actions the enterprise's other participants took in furtherance of the enterprise.

226.

In 2021, MiMedx sued Petit and Taylor for restitution.  As a federal judge determined in denying MiMedx's restitution claim, MiMedx was "not a victim" of the fraudulent scheme.[294]  Noting that it is inappropriate to grant restitution to a company whose "corporate culture emphasized the importance of employees meeting financial goals," the Court found that "the scheme was designed to benefit MiMedx," and "MiMedx could have been—but was ultimately not—criminally charged as a result of [Petit and Taylor]'s conduct."[295]

### *Violations of O.C.G.A. § 16-14-4(b)*

227.

Through a pattern of racketeering activities, each Defendant directly conducted the affairs of the enterprise in violation of O.C.G.A. § 16-14-4(b).

228.

Through a pattern of racketeering activities, each Defendant indirectly conducted the affairs of the enterprise in violation of O.C.G.A. § 16-14-4(b).

---

[294] Memorandum Order, *United States v. Petit, Taylor*, Case No. 19-cr-850 (S.D.N.Y. May 23, 2021) (**Exhibit III**) at p. 10.
[295] *Id.* at pp. 11-12.

229.

Through a pattern of racketeering activities, each Defendant directly participated in the affairs of the enterprise in violation of O.C.G.A. § 16-14-4(b).

230.

Through a pattern of racketeering activities, each Defendant indirectly participated in the affairs of the enterprise in violation of O.C.G.A. § 16-14-4(b).

231.

Defendants' conduct in violation of O.C.G.A. § 16-14-4(b) was the direct and proximate cause of Plaintiffs' injuries.

232.

Pursuant to O.C.G.A. § 16-14-6(c), Plaintiffs are entitled to recover treble damages, punitive damages, and attorneys' fees and litigation costs from Defendants for the damages caused by their violations of O.C.G.A. § 16-14-4. Clear and convincing evidence will establish, among other things, that Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of case that would raise the presumption of conscious indifference to consequences.

## COUNT II
## GEORGIA RICO O.C.G.A. 16-14-4(a)
(Against Individual Defendants)

233.

Plaintiffs incorporate the allegations in paragraphs 1-220 as if fully set forth

herein.

### *Enterprise*

234.

MiMedx is corporation that is an enterprise pursuant to O.C.G.A. § 16-14-

3(3).

### *Violations of O.C.G.A. 16-6-4(a)*

235.

Through a pattern of racketeering activities or proceeds derived therefrom,

Petit, Taylor, Senken, Dewberry, and Evans each acquired or maintained, directly

or indirectly, an interest in or control of the enterprise, real property, conducted

MiMedx's affairs through an unlawful pattern of activity and used MiMedx as a

vehicle for those unlawful purposes.

236.

As CEO and Chairman, Petit received bonuses, stock, and stock options

awards.  Petit's bonuses were directly tied to the performance of MiMedx, through

the Management Incentive Plan.

237.

During his tenure, Petit received common stock and stock options collectively amounting to more than 4,584,435 shares.  During the commission of his fraudulent scheme (2012-2018), MiMedx awarded Petit with stock and stock options on at least 21 occasions.

238.

Through a pattern of racketeering activities, Petit violated O.C.G.A. § 16-14-4(a) by:

(i)    Acquiring, directly or indirectly, an interest in the enterprise and/or personal property, including by receiving stock options as a reward for MiMedx's performance that Petit had helped fraudulently inflate;

(ii)   Maintaining, directly or indirectly, an interest in the enterprise, including by repeatedly concealing MiMedx's failure to meet revenue guidance and fraudulently inflating MiMedx's sales, creating job security and enhanced compensation for Petit;

(iii)  Acquiring, directly or indirectly, control of the enterprise and personal property, including by receiving stock and stock options as a reward for MiMedx's inflated performance;

(iv)   Maintaining, directly or indirectly, control in the enterprise, including by repeatedly concealing MiMedx's failure to meet revenue guidance

and inflating MiMedx's sales, creating job security and enhanced

compensation for Petit.

(v)     Acquiring, directly or indirectly, an interest in and control over money

in the form of bonuses Petit received as a direct result of his scheme to

fraudulently inflate MiMedx's performance.

239.

As COO and Director, Taylor received bonuses, stock, and stock options

awards.  Taylor's bonuses were directly tied to the performance of MiMedx,

through the Management Incentive Plan.  During his tenure, Taylor received

common stock and stock options collectively amounting to more than 1,750,000

shares.  During the commission of his fraudulent scheme (2012-2018), MiMedx

awarded Taylor with stock and stock options on at least 12 occasions.

240.

Through a pattern of racketeering activities, Taylor violated O.C.G.A. § 16-

14-4(a) by:

(i)     Acquiring, directly or indirectly, an interest in the enterprise and/or

personal property, including by receiving stock options as a reward

for MiMedx's performance that Taylor had helped fraudulently

inflate;

(ii)    Maintaining, directly or indirectly, an interest in the enterprise,

including by repeatedly concealing MiMedx's failure to meet revenue guidance and fraudulently inflating MiMedx's sales, creating job security and enhanced compensation for Taylor;

(iii)   Acquiring, directly or indirectly, control of the enterprise and personal property, including by receiving stock options as a reward for MiMedx's inflated performance;

(iv)   Maintaining, directly or indirectly, control in the enterprise, including by repeatedly concealing MiMedx's failure to meet revenue guidance and inflating MiMedx's sales, creating job security and enhanced compensation for Taylor; and

(v)   Acquiring, directly or indirectly, an interest in and control over money in the form of bonuses Taylor received as a direct result of his scheme to fraudulently inflate MiMedx's performance.

(vi)   Acquiring, directly or indirectly, an interest in and control over money when Taylor exercised and sold thousands of shares of MiMedx stock, many of which Taylor sold when the stock price was at its most inflated.

241.

As Chief Financial Officer, Senken received bonuses, stock, and stock options awards.  Senken's bonuses were directly tied to the performance of

MiMedx, through the Management Incentive Plan.

242.

During his tenure, Senken received common stock and stock options collectively amounting to more than 581,557 shares.  During the commission of his fraudulent scheme (2012-2018), MiMedx awarded Senken with stock and stock options on at least 13 occasions.

243.

Through a pattern of racketeering activities, Senken violated O.C.G.A. § 16-14-4(a) by:

(i)     Acquiring, directly or indirectly, an interest in the enterprise and/or personal property, including by receiving stock options as a reward for MiMedx's performance that Senken had helped fraudulently inflate;

(ii)     Maintaining, directly or indirectly, an interest in the enterprise, including by repeatedly concealing MiMedx's failure to meet revenue guidance and fraudulently inflating MiMedx's sales, creating job security and enhanced compensation for Senken;

(iii)     Acquiring, directly or indirectly, control of the enterprise and personal property, including by receiving stock options as a reward for MiMedx's inflated performance;

(iv)    Maintaining, directly or indirectly, control in the enterprise, including by repeatedly concealing MiMedx's failure to meet revenue guidance and inflating MiMedx's sales, creating job security and enhanced compensation for Senken; and

(v)     Acquiring, directly or indirectly, an interest in and control over money in the form of bonuses Senken received as a direct result of his scheme to fraudulently inflate MiMedx's performance.

244.

As a Director and Audit Committee member, Dewberry received stock and stock awards.  During his tenure, Dewberry received common stock and stock options collectively amounting to more than 200,121 shares.

245.

During the commission of his fraudulent scheme (2012-2018), MiMedx awarded Dewberry with stock and stock options on at least 8 occasions.

246.

Through a pattern of racketeering activities, Dewberry violated O.C.G.A. § 16-14-4(a) by:

(i)     Acquiring, directly or indirectly, an interest in the enterprise and/or personal property, including by receiving stock options as a reward for MiMedx's performance that Dewberry had helped fraudulently

inflate;

(ii)    Maintaining, directly or indirectly, an interest in the enterprise,
including by repeatedly concealing MiMedx's failure to meet revenue
guidance and fraudulently inflating MiMedx's sales, creating job
security and enhanced compensation for Dewberry;

(iii)   Acquiring, directly or indirectly, control of the enterprise and personal
property, including by receiving stock options as a reward for
MiMedx's inflated performance; and

(iv)    Maintaining, directly or indirectly, control in the enterprise, including
by repeatedly concealing MiMedx's failure to meet revenue guidance
and inflating MiMedx's sales, creating job security and enhanced
compensation for Dewberry.

247.

As a Director, Chairman, and Audit Committee member, Evans received
stock and stock options awards.  During his tenure, Evans received common stock
and stock options collectively amounting to more than 126,357 shares.  During the
commission of his fraudulent scheme (2012-2018), MiMedx awarded Evans with
stock and stock options on at least 5 occasions.

248.

Through a pattern of racketeering activities, Evans violated O.C.G.A. § 16-

14-4(a) by:

    (i)     Acquiring, directly or indirectly, an interest in the enterprise and/or personal property, including by receiving stock options as a reward for MiMedx's performance that Evans had helped fraudulently inflate;

    (ii)    Maintaining, directly or indirectly, an interest in the enterprise, including by repeatedly concealing MiMedx's failure to meet revenue guidance and fraudulently inflating MiMedx's sales, creating job security for Evans;

    (iii)   Acquiring, directly or indirectly, control of the enterprise and personal property, including by receiving stock options as a reward for MiMedx's inflated performance; and

    (iv)   Maintaining, directly or indirectly, control in the enterprise, including by repeatedly concealing MiMedx's failure to meet revenue guidance and inflating MiMedx's sales, creating job security for Evans.

249.

Defendants' conduct in violation of O.C.G.A. § 16-14-4(a) was the direct and proximate cause of Plaintiffs' injuries.

250.

Pursuant to O.C.G.A. § 16-14-6(c), Plaintiffs are entitled to recover treble damages, punitive damages, and attorneys' fees and litigation costs from

Defendants for the damages caused by their violations of O.C.G.A. § 16-14-4. Clear and convincing evidence will establish, among other things, that Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of case that would raise the presumption of conscious indifference to consequences.

## COUNT III
## GEORGIA RICO O.C.G.A. 16-14-4(c) (Conspiracy)
(Against Individual Defendants)

### 251.

Plaintiffs incorporate the allegations in paragraphs 1-250 as if fully set forth herein.

### 252.

Defendants violated O.C.G.A. § 16-14-4(c) by conspiring to acquire or maintain, directly or indirectly, an interest in or control of an enterprise or personal property, including money (O.C.G.A. §§ 16-14-4(a)).

### 253.

Defendants also violated O.C.G.A. § 16-14-4(c) by conspiring to conduct or participate in, directly or indirectly, an enterprise through a pattern of racketeering activity.

### 254.

As part of the conspiracy, Defendants agreed to a common unlawful

objective and committed overt acts, including but not limited to acts of racketeering activity, in furtherance of the conspiracy.

255.

Defendants have pursued, and joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.

256.

Defendants were aware of and agreed to the general criminal objectives of their jointly undertaken scheme.  Defendants knowingly and willfully joined in a conspiracy which itself contained a common plan or purpose to commit two or more predicate acts.

257.

The object or purpose of the conspiracy included facilitating the commission of acts of racketeering activity by its members and committing further acts of racketeering to conceal those that had already occurred.

258.

The purposes of the conspiracy were not accomplished, nor was the conspiracy abandoned, more than five years prior to the filing of this Complaint.

259.

Defendants undertook a number of overt acts in furtherance of the

conspiracy.

260.

Petit's overt acts in furtherance of the conspiracy include, but are not limited to:

(i)    The acts of securities fraud detailed in paragraph 204, including those for which Petit was criminally convicted;

(ii)    The acts of wire and mail fraud detailed in paragraphs 214-217;

(iii)    Making and approving false statements and material omissions about MiMedx's sales, financial performance, distributor agreements, and accounting practices in press releases, annual reports, and earnings calls;

(iv)    Preparing a false and misleading "management response" to Anderson's revenue recognition allegations that (1) lied about Anderson's allegations and (2) pressured the Audit Committee to adopt certain predetermined findings exonerating Petit, Taylor, and Senken;

(v)    Removing Anderson from the Controller position so that Anderson's signature would not be required for MiMedx's management representation letter to outside auditors;

(vi)    Threatening MiMedx sales team members to ensure that sales goals

129

were met by any means necessary;

(vii)   Authorizing frivolous, malicious lawsuits against whistleblowers and

Wall Street analysts; and

(viii)  Soliciting and accepting performance-based bonuses, stock, and stock

options awards Petit knew to be premised on fraudulently inflated

performance.

261.

Taylor's overt acts in furtherance of the conspiracy include, but are not

limited to:

(i)     The acts of securities fraud detailed in paragraph 205, including those

related to Taylor's criminal conviction for conspiracy to commit

securities fraud;

(ii)    The acts of wire and mail fraud detailed in paragraphs 214-217;

(iii)   Making and approving false statements and material omissions about

MiMedx's sales, financial performance, distributor agreements, and

accounting practices in press releases, annual reports, and earnings

calls;

(iv)    Preparing a false and misleading "management response" to

Anderson's revenue recognition allegations that (1) lied about

Anderson's allegations and (2) pressured the Audit Committee to

adopt certain predetermined findings exonerating Petit, Taylor, and Senken;

(v)    Removing Anderson from the Controller position so that Anderson's signature would not be required for MiMedx's management representation letter to outside auditors;

(vi)    Threatening MiMedx sales team members to ensure that sales goals were met by any means necessary;

(vii)    Authorizing frivolous, malicious lawsuits against whistleblowers and Wall Street analysts; and

(viii)  Soliciting and accepting performance-based bonuses, stock, and stock options awards Taylor knew to be premised on fraudulently inflated performance.

262.

Senken's overt acts in furtherance of the conspiracy include, but are not limited to:

(i)    The acts of securities fraud detailed in paragraph 206;

(ii)    The acts of wire fraud detailed in paragraphs 214-217;

(iii)    Making and approving false statements and material omissions about MiMedx's sales, financial performance, distributor agreements, and accounting practices in press releases, annual reports, and earnings

calls;

(iv)     Telling Anderson that the channel stuffing and revenue recognition

issues Anderson identified were normal business practices;

(v)      Removing Anderson from the Controller position so that Anderson's

signature would not be required for MiMedx's management

representation letter to outside auditors;

(vi)     Preparing a false and misleading "management response" to

Anderson's revenue recognition allegations that (1) lied about

Anderson's allegations and (2) pressured the Audit Committee to

adopt certain predetermined findings exonerating Petit, Taylor, and

Senken;

(vii)    Threatening MiMedx sales team members to ensure that sales goals

were met by any means necessary; and

(viii)   Soliciting and accepting performance-based bonuses, stock, and stock

options awards Senken knew to be premised on fraudulently inflated

performance.

263.

Dewberry's overt acts in furtherance of the conspiracy include, but are not

limited to:

(i)      The acts of securities fraud detailed in paragraph 207;

(ii)    The acts of wire fraud detailed in paragraphs 214-217;

(iii)    Conducting one or more sham investigations into allegations of channel stuffing and revenue recognition irregularities;

(iv)    Adopting what Dewberry knew to be the false and misleading "management response" to Anderson's revenue recognition allegations; and

(v)    Soliciting and accepting performance-based stock, and stock options awards Dewberry knew to be premised on fraudulently inflated performance.

264.

Evans' overt acts in furtherance of the conspiracy include, but are not limited to:

(i)    The acts of securities fraud detailed in paragraph 208;

(ii)    The acts of wire fraud detailed in paragraphs 214-217;

(iii)    Conducting one or more sham investigations into allegations of channel stuffing and revenue recognition irregularities;

(iv)    Adopting what Evans knew to be the false and misleading "management response" to Anderson's revenue recognition allegations; and

(v)    Soliciting and accepting performance-based stock, and stock options

awards Evans knew to be premised on fraudulently inflated performance.

265.

Defendants' conduct in violation of O.C.G.A. § 16-14-4(c) was the direct and proximate cause of Plaintiffs' injuries.

266.

Pursuant to O.C.G.A. § 16-14-6(c), Plaintiffs are entitled to recover treble damages, punitive damages, and attorneys' fees and litigation costs from Defendants for the damages caused by their violations of O.C.G.A. § 16-14-4. Clear and convincing evidence will establish, among other things, that Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of case that would raise the presumption of conscious indifference to consequences.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**
(Against Individual Defendants)

267.

Plaintiffs incorporate the allegations in paragraphs 1-199 as if fully set forth herein.

268.

Plaintiffs bring direct claims against Defendants for breach of fiduciary duty.

269.

Plaintiffs have standing to bring direct claims for breach of fiduciary duty because Plaintiffs, as MiMedx call options investors, suffered injury that is separate and distinct from that suffered by MiMedx's other shareholders. Plaintiffs' injuries also relate to or arise from contractual rights which exist independently of any right of MiMedx.

270.

By virtue of their positions as officers, directors, and/or fiduciaries of MiMedx and because of their ability to control the business and corporate affairs of MiMedx, the Individual Defendants owed fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage MiMedx in a fair, just, honest, and equitable manner.

271.

The Individual Defendants were required to avoid either actual or apparent conflicts of interest, so as to benefit all investors, including Plaintiffs, equally and not act in furtherance of their personal interest or benefit.

272.

The Individual Defendants owed the fiduciary duty to exercise good faith and diligence and the highest obligations of fair dealing in the administration of the affairs of MiMedx and in the use and preservation of its property and assets.

273.

The Individual Defendants, because of their positions of control and authority as directors and/or officers of MiMedx, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

274.

Because of their advisory, executive, managerial, and directorial positions within MiMedx, each of the Individual Defendants had actual knowledge of material, nonpublic information regarding MiMedx.

275.

To discharge their duties, the officers and directors of MiMedx were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of MiMedx.

276.

By virtue of such duties, the officers and directors of MiMedx were required to, among other things:

(i)     ensure MiMedx maintained adequate internal controls over accounting and financial reporting;

(ii)    ensure that MiMedx was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(iii)   ensure that MiMedx complied with its legal obligations and

requirements including requirements involving filing accurate

financial and operational information with the SEC—and refrain from

engaging in deceptive conduct;

(iv)    ensure processes were in place for maintaining the integrity and

reputation of MiMedx and reinforcing a culture of ethics, compliance,

and appropriate risk management;

(v)    conduct the affairs of MiMedx in an efficient, business-like manner in

compliance with all applicable laws, rules, and regulations so as to

make it possible to provide the highest quality performance of its

business, to avoid wasting MiMedx's assets, to maximize the value of

MiMedx's stock;

(vi)    remain informed as to how MiMedx conducted its operations upon

receipt of notice or information of imprudent or unsound conditions or

practices, make a reasonable inquiry in connection therewith, to take

steps to correct such conditions or practices and make such

disclosures as necessary to comply with applicable laws; and

(vii)    truthfully and accurately guide investors and securities analysts as to

the business operations of MiMedx.

277.

Additionally, MiMedx's Code of Conduct in effect at the relevant times

137

mandated that the Individual Defendants' activities comply with all laws and regulatory requirements.

278.

The conduct of the Individual Defendants involved a knowing and culpable violation of their fiduciary obligations as officers and directors of MiMedx, the absence of good faith on their part, and a reckless disregard for their duties that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to Plaintiffs.

279.

The Individual Defendants breached their duty of loyalty and good faith by allowing others to cause, or by themselves causing, MiMedx to:

(i)     operate with inadequate financial and governance internal controls;

(ii)    overstate its revenues for a number of years;

(iii)   engage in an illicit channel stuffing scheme;

(iv)   make improper statements to the public and MiMedx's investors including Plaintiffs;

(v)    fail to correct material misstatements made to its shareholders and the investing public including Plaintiffs;

(vi)   pay improper compensation packages to the Individual Defendants; and

(vii)   causing MiMedx to repurchase millions of its shares in the market even though they knew the price of MiMedx's stock was artificially inflated.

280.

These improper practices wasted MiMedx's assets and caused substantial damage.

281.

Defendants breached their duty of loyalty and good faith by approving the improper statements and failing to properly oversee and correct MiMedx's public statements and internal control functions.

282.

As MiMedx admitted in 2019, the Individual Defendants knew MiMedx's highly touted quarter-after-quarter revenue growth was substantially the result of channel stuffing and other improper sales and distribution practices and fraudulent revenue recognition.

283.

MiMedx's Special Litigation Committee, formed in or around June 2018, determined there was sufficient evidence to show that Individual Defendants including Petit, Taylor, and Senken breached their fiduciary duties.

284.

As a result of the Individual Defendants' breaches of fiduciary duties, MiMedx was required to undertake a massive internal investigation (incurring significant forensic accounting and legal fees) examining the wrongful conduct of its fiduciaries, restate multiple years of financial reporting, and secure additional credit financing to permit its operations to continue.

285.

The Individual Defendants' improper conduct spawned private lawsuits as well as governmental investigations by the SEC, DOJ, VA, and Defense Department.  MiMedx has expended significant sums of money for the lawsuits and investigations.

286.

The Individual Defendants increased compensation paid to themselves generally as a reward for MiMedx financial performance and specifically through incentive compensation plans targeting financial performance.

287.

For example, Defendant Senken's target base bonus under MiMedx's management incentive plan was 40% for 2013-2014, 45% for 2015, and 50% of Senken's annual base salary from 2016 forward.

288.

As a result of Defendants' breaches of fiduciary duty, Plaintiffs suffered damages in an amount to be determined at trial.  Specifically, as a direct and proximate result of Individual Defendants' misrepresentations, omissions, and other breaches of their fiduciary duties, Plaintiffs suffered a loss on their MiMedx call options investment.  The revelation of the Individual Defendants' conduct cratered the price of MiMedx common stock and the value of Plaintiffs' call options that was wholly tied to the price of MiMedx common stock.

289.

In breaching their fiduciary duties, the Individual Defendants acted with the specific intent to cause harm to the Plaintiffs.

## COUNT V
## PUNITIVE DAMAGES
(Against All Defendants)

290.

Plaintiffs incorporate the allegations in paragraphs 1-289 as if fully set forth herein.

291.

The Individual Defendants engaged in willful misconduct, acted with malice, and have engaged in fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

141

292.

The Individual Defendants acted with specific intent to cause harm to the Plaintiffs.

293.

In light of the allegations set forth herein, Plaintiffs are entitled to punitive damages.

**COUNT VI**
**ATTORNEYS' FEES**
(Against All Defendants)

294.

Plaintiffs incorporate the allegations in paragraphs 1-293 as if fully set forth herein.

295.

Defendants have acted in bad faith, has been stubbornly litigious and have caused Plaintiffs unnecessary trouble and expense.

296.

Pursuant to O.C.G.A. § 13-6-11 and Articles 10 and 16 of the Georgia Code, Plaintiffs are entitled to recover from Defendants their expenses of litigation, including, but not limited to, attorneys' fees.

WHEREFORE, Plaintiffs demand that judgment be entered in their favor and against Defendants granting the following:

(a)     judgment against Defendants for compensatory damages and

prejudgment and post-judgment interest;

(b)     judgment against Defendants for punitive damages;

(c)     judgment against Defendants for actual and treble damages resulting

from Defendants' violations of O.C.G.A. § 16-14-4;

(d)     judgment against Defendants for all costs, expenses and attorneys' fees

permitted by applicable law; and

(e)     such other and further relief as this Court deems just and appropriate.

**Pursuant to O.C.G.A. § 16-14-6(c), Plaintiffs demand a trial by jury.**

Respectfully submitted this 4th day of November, 2022.

**KREVOLIN & HORST, LLC**

*/s/ Jeffrey D. Horst*
Jeffrey D. Horst
Georgia Bar No. 367834
Zahra S. Karinshak
Georgia Bar No. 407911
R. David Gallo
Georgia Bar No. 228283
One Atlantic Center, Suite 3250
1201 West Peachtree St., N.W.
Atlanta, GA 30309
(404) 888-9700
(404) 888-9577 (facsimile)
horst@khlawfirm.com
karinshak@khlawfirm.com
dgallo@khlawfirm.com

**CARROLL LAW FIRM LLC**

*/s/ Stacey A. Carroll*
Stacey A. Carroll
Georgia Bar No. 112730
295 W. Crossville Rd.
Suite 730
Roswell, Georgia 30075
(404) 816-4555
(404) 481-2074 (facsimile)
Stacey@carroll-firm.com

*Attorneys for Plaintiffs*

# APPENDIX 1
# Selected Fraudulent Statements

| | Document (date) | Relevant Defendant(s) | Fraudulent statements include, but are not limited to: | Exhibit |
|---|---|---|---|---|
| **1** | 8-K, Ex. 99.1 (press release) (dated 5/1/13) | Issued by: MiMedx<br><br>8-K signed by: Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | "The Company recorded record revenue for the quarter" (p. 1)<br><br>"The Company reaffirmed its previously communicated goals for second quarter of 2013 revenue to be in the range of $11.5 million to $13.5 million and full year 2013 revenue to be in the range of $50 million to $60 million." (p. 4) | **FF** |
| **2** | 10-Q for Q1 2013 (filed 5/10/13) | Issued by: MiMedx<br><br>Signed by: Senken<br><br>Certified pursuant to Sarbanes-Oxley Act of 2002 ("SOX certified") by: Petit, Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | Reporting net sales of $11,556,493 (p. 4), knowing a material portion of these sales were illegitimate.<br><br>"The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. In cases where the Company utilized distributors or ships product directly to the end user, it recognizes revenue upon shipment provided all revenue recognition criteria have been met. The Company records estimated sales returns, discounts and allowances as a reduction of net sales in the same period revenue is recognized." (p. 8)<br><br>"our Chief Executive Officer [Petit] and Principal Financial Officer [Senken] concluded that our [SEC disclosure] controls and procedures were effective as of the end of the period covered by this report" (p. 21) | **EE** |
| **3** | 8-K, Ex. 99.1 (dated 7/19/13) | Issued by: MiMedx<br><br>8-K signed by: Senken | "the Company will slightly exceed the $13.5 million high end of its previously communicated revenue range for second quarter of 2013" (p. 1) | **HH** |

# APPENDIX 1
## Selected Fraudulent Statements

| | | | | |
|---|---|---|---|---|
| | | Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | "The Company reported that the second quarter of 2013 marks the 7th consecutive quarter in which MiMedx has met or exceeded its revenue guidance" (p. 1)<br><br>"The Company also increased its guidance for the lower end of its full year 2013 revenue range. MiMedx reported that it now expects the Company's 2013 full year revenue to be in the range of $54 million to $60 million" (p. 1) | |
| 4 | 8-K, Ex. 99.1 (dated 7/31/13) | Issued by: MiMedx<br><br>8-K signed by: Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | "The Company recorded record revenue of $13.51 million for the quarter" (p. 1)<br><br>"we exceeded the $13.5 million upper range of our goal and achieved greater than a 175% increase over our 2012 second quarter revenue. This was our 7th straight quarter of meeting or exceeding our revenue forecast." (p. 2)<br><br>"The Company reaffirmed its previously communicated guidance for full year 2013, but increased the lower end of the range. 2013 full year revenue is forecasted to be in the range of $54 million to $60 million" (p. 4) | **II** |
| 5 | 10-Q for Q2 2013 (filed 8/8/13) | Issued by: MiMedx<br><br>Signed by: Senken<br><br>Certified pursuant to Sarbanes-Oxley Act of 2002 ("SOX certified") by: Petit, Senken<br><br>Reviewed and approved by: Petit, Taylor, | Reporting net sales of $13,514,743 (p. 5), knowing a material portion of these sales were illegitimate.<br><br>"The Company recognizes revenue when title to the goods transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. In cases where the Company utilized distributors or ships product directly to the end user, it recognizes revenue upon shipment provided all revenue recognition criteria have been met. The Company records estimated sales returns, | **GG** |

# APPENDIX 1
# Selected Fraudulent Statements

| | | | | |
|---|---|---|---|---|
| | | Senken, Dewberry, Evans, MiMedx | discounts and allowances as a reduction of net sales in the same period revenue is recognized." (p. 9)<br><br>"our Chief Executive Officer [Petit] and Principal Financial Officer [Senken] concluded that our [SEC disclosure] controls and procedures were effective as of the end of the period covered by this report" (p. 25) | |
| 6 | 8-K, Ex. 99.1 (dated 10/30/13) | Issued by: MiMedx<br><br>8-K signed by: Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | "The Company recorded record revenue for the quarter" (p. 1)<br><br>"For the nine months ended September 30, 2013, the Company recorded record revenue of $41.2 million, an increase of nearly 150% over revenue of $16.5 million recorded for the first nine months of 2012" (p. 1)<br><br>"We exceeded the $16.0 million upper range of our goal and achieved greater than a 100% increase over our 2012 third quarter revenue. This was our 8th straight quarter where we met or exceeded the upper end of our revenue forecast." (p. 2) | **KK** |
| 7 | 10-Q for Q3 2013 (filed 11/8/13) | Issued by: MiMedx<br><br>Signed by: Senken<br><br>Certified pursuant to Sarbanes-Oxley Act of 2002 ("SOX certified") by: Petit, Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | Reporting net sales of $16,115,708 (p. 5), knowing a material portion of these sales were illegitimate.<br><br>"The Company recognizes revenue when title to the goods transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. In cases where the Company utilizes distributors or ships product directly to the end user, it recognizes revenue upon shipment provided all revenue recognition criteria have been met." (p. 9) | **JJ** |

3

# APPENDIX 1
# Selected Fraudulent Statements

| | | | "our Chief Executive Officer [Petit] and Principal Financial Officer [Senken] concluded that our controls and procedures were effective as of the end of the period covered by this report" (p. 28) | |
|---|---|---|---|---|
| 8 | 8-K, Ex. 99.1 (dated 2/26/13) | Issued by: MiMedx<br><br>8-K signed by: Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | "The Company recorded record revenue for the fourth quarter of 2013 of $18.0 million, an increase of 71% over 2012 fourth quarter revenue of $10.5 million." (p. 1)<br><br>"The Company recorded record revenue for the year ended December 31, 2013, of $59.2 million, an increase of 119% over 2012 revenue of $27.1 million." (p. 1)<br><br>"We had strong quarter-over-quarter growth and more than doubled our revenue over 2012. The fourth quarter of 2013 was our ninth consecutive quarter where we met or exceeded our revenue forecast." (p. 2) | **LL** |
| 9 | 10-K for Q4 and full year 2013 (filed 3/4/14) | Issued by: MiMedx<br><br>Signed by: Petit, Taylor, Senken<br><br>SOX certified by: Petit, Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | Reporting net sales of $59,180,734 (p. 31), knowing a material portion of these sales were illegitimate.<br><br>"The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. In cases where the Company utilizes distributors or ships products directly to the end user, it recognizes revenue according to the shipping terms of the agreement provided all revenue recognition criteria have been met." (p. 51)<br><br>"our Chief Executive Officer [Petit] and Chief Financial Officer [Senken] concluded that our disclosure controls and procedures were effective as of the end of the period covered by this Annual Report on Form 10-K" (p. 69) | **W** |

# APPENDIX 1
## Selected Fraudulent Statements

| 10 | 8-K, Ex. 99.1 (dated 4/7/14) | Issued by: MiMedx<br><br>8-K signed by: Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | "first quarter of 2014 revenue slightly exceeded the upper end of its previously announced guidance" (p. 1)<br><br>"The Company estimates second quarter of 2014 revenue will be in the range of $21.5 million to $23.5 million. On March 24, 2014, the Company updated its guidance for full year 2014 and forecasted its revenue to be in the range of $95 million to $110 million" (p. 1)<br><br>"'The first quarter of 2014 marks the tenth straight quarter that we have met or exceeded our revenue guidance. Considering our very rapid growth rate, this should be a compliment to our management team for managing the many variables involved,' added Petit." (p. 1) | **NN** |
| --- | --- | --- | --- | --- |
| 11 | 10-Q for Q1 2014 (filed 5/12/14) | Issued by: MiMedx<br><br>Signed by: Senken<br><br>Certified pursuant to Sarbanes-Oxley Act of 2002 ("SOX certified") by: Petit, Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | Reporting net sales of $19,559,188 (p. 5), knowing a material portion of these sales were illegitimate.<br><br>"The Company recognizes revenue when title to the goods transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. In cases where the Company utilizes distributors or ships product directly to the end user, it recognizes revenue upon shipment provided all revenue recognition criteria have been met." (p. 8)<br><br>"the Company's Chief Executive Officer [Petit] and Principal Financial Officer [Senken] concluded that the Company's controls and procedures were effective as of the end of the period covered by this report." (p. 21) | **MM** |
| 12 | 8-K, Ex. 99.1 (dated 7/28/14) | Issued by: MiMedx | "The Company recorded record revenue for the second quarter of 2014 of $25.6 million, a $12.1 million of 89% increase over 2013 | **PP** |

# APPENDIX 1
## Selected Fraudulent Statements

| | | 8-K signed by: Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | second quarter revenue of $13.5 million, and above its latest guidance range of $24 million to $25 million." (p. 1)<br><br>"For the six months ended June 30, 2014, the Company recorded record revenue of $45.1 million, a $20.1 million or 80% increase over revenue of $25.1 million for the first six months of 2013." (p. 1)<br><br>"Parker H. "Pete" Petit, Chairman and CEO, said, 'Our second quarter results were excellent. We achieved impressive top line growth and solid improvements to our bottom line. During the quarter, we twice increased our initial revenue guidance, and we ultimately exceeded the $25 million upper end of our latest guidance. The second quarter marked our 11th straight quarter in which we met or exceeded our revenue forecast.'" (p. 1) | |
|---|---|---|---|---|
| 13 | 10-Q for Q2 2014 (filed 8/11/14) | Issued by: MiMedx<br><br>Signed by: Senken<br><br>Certified pursuant to Sarbanes-Oxley Act of 2002 ("SOX certified") by: Petit, Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | Reporting net sales of $25,573,198 (p. 5), knowing a material portion of these sales were illegitimate.<br><br>"The Company recognizes revenue when title to the goods transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. In cases where the Company utilizes distributors or ships product directly to the end user, it recognizes revenue upon shipment provided all revenue recognition criteria have been met." (p. 8)<br><br>"the Company's Chief Executive Officer [Petit] and Principal Financial Officer [Senken] concluded that the Company's controls and procedures were effective as of the end of the period covered by this report" (p. 23) | **OO** |

6

# APPENDIX 1
## Selected Fraudulent Statements

| 14 | 8-K, Ex. 99.1 (dated 10/30/14) | Issued by: MiMedx<br><br>8-K signed by: Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | "The Company recorded record revenue for the third quarter of 2014 of $33.5 million, a $17.4 million or 108% increase over 2013 third quarter revenue of $16.1 million, and sequentially, a $7.9 million or 31% increase over second quarter of 2014 revenue." (p. 1)<br><br>"Parker H. "Pete" Petit, Chairman and CEO, stated, "It is very gratifying to report a quarterly operating profit for the first time in our history. We are pleased with our ability to assemble the resources and infrastructure necessary to drive our strong period over-period revenue growth while continually improving our cash flow, EBITDA and now profit. Our third quarter operating profit of $3.7 million is 11% of revenue and our third quarter positive Adjusted EBITDA* of $7.3 million is 22% of revenue. Both of these statistics are the highest in our history. This quarter marked the 11th consecutive quarter of reporting positive Adjusted EBITDA*." (p. 3) | RR |
| 15 | 10-Q for Q3 2014 (filed 11/11/14) | Issued by: MiMedx<br><br>Signed by: Senken<br><br>Certified pursuant to Sarbanes-Oxley Act of 2002 ("SOX certified") by: Petit, Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | Reporting net sales of $33,517,762 (p. 5), knowing a material portion of these sales were illegitimate.<br><br>"The Company recognizes revenue when title to the goods transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. In cases where the Company utilizes distributors or ships product directly to the end user, it recognizes revenue upon shipment provided all revenue recognition criteria have been met." (p. 8)<br><br>"the Company's Chief Executive Officer [Petit] and Chief Financial Officer [Senken] concluded that the Company's [SEC disclosure] controls and procedures were effective as of the end of the period covered by this report" (p. 23) | QQ |

7

# APPENDIX 1
## Selected Fraudulent Statements

| | | | | |
|---|---|---|---|---|
| **16** | 8-K, Ex. 99.1 (dated 2/26/15) | Issued by: MiMedx<br><br>8-K signed by: Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | "For the year ended December 31, 2014, the Company recorded record revenue of $118.2 million, a $59.0 million or 100% increase over revenue of $59.2 million for full year 2013." (p. 1)<br><br>"The Company recorded record revenue for the fourth quarter of 2014 of $39.6 million, a $21.6 million or 120% increase over 2013 fourth quarter revenue of $18.0 million, and sequentially, a $6.1 million or 18% increase over third quarter of 2014 revenue." (p. 1)<br><br>"Parker H. "Pete" Petit, Chairman and CEO, stated, 'We are pleased to announce our 2014 results. The fourth quarter was our thirteenth consecutive quarter of meeting or exceeding revenue guidance, and full year 2014 was the third consecutive year of meeting or exceeding our guidance. Our full year revenue was double last year's revenue and fourth quarter revenue was a 120% increase over last year's fourth quarter revenue. Throughout 2014, we continually increased our revenue growth rate over the prior year's quarter with a 69% growth rate in the first quarter, 89% in the second quarter, 108% in the third quarter and 120% in the fourth quarter.'" (p. 3) | **SS** |
| **17** | 10-K for Q4 and full year 2014 (filed 3/13/15) | Issued by: MiMedx<br><br>Signed by: Petit, Taylor, Senken<br><br>SOX certified by: Petit, Senken<br><br>Reviewed and approved by: Petit, Taylor, | Reporting net sales of $118,223,000 (p. 33), knowing a material portion of these sales were illegitimate.<br><br>"The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. In cases where the Company utilizes distributors or ships products directly to the end user, it recognizes revenue according to the shipping terms of the agreement provided all revenue recognition criteria have been met." (p. 52) | **X** |

8

# APPENDIX 1
## Selected Fraudulent Statements

| | | Senken, Dewberry, Evans, MiMedx | "our Chief Executive Officer [Petit] and Chief Financial Officer [Senken] concluded that our [SEC] disclosure controls and procedures were effective as of the end of the period covered by this Annual Report on Form 10-K" (p. 71) | |
|---|---|---|---|---|
| **18** | 8-K, Ex. 99.1 (dated 4/13/15) | Issued by: MiMedx<br><br>8-K signed by: Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | "The Company recorded record revenue for the quarter ended March 31, 2015 of $40.8 million, a $21.2 million or 108% increase over first quarter of 2014 revenue of $19.6 million" (p. 1)<br><br>"Parker H. Petit, Chairman and CEO, said, "We are pleased to announce our fourteenth consecutive quarter of meeting or exceeding revenue guidance." (p. 1)<br><br>"The Company reiterated its previously communicated guidance for full year 2015 revenue to be in the range of $175.0 million to $190.0 million." (p. 1) | **UU** |
| **19** | 10-Q for Q1 2015 (filed 5/1/15) | Issued by: MiMedx<br><br>Signed by: Senken<br><br>Certified pursuant to Sarbanes-Oxley Act of 2002 ("SOX certified") by: Petit, Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | Reporting net sales of $40,767,000 (p. 5), knowing a material portion of these sales were illegitimate.<br><br>"The Company recognizes revenue when title to the goods transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. In cases where the Company utilizes distributors or ships product directly to the end user, it recognizes revenue upon shipment provided all other revenue recognition criteria have been met." (p. 8)<br><br>"the Company's Chief Executive Officer [Petit] and Chief Financial Officer [Senken] concluded that the Company's [SEC disclosure] controls and procedures were effective as of the end of the period covered by this report" (p. 24) | **TT** |

# APPENDIX 1
## Selected Fraudulent Statements

| 20 | 8-K, Ex. 99.1 (dated 7/30/15) | Issued by: MiMedx<br><br>8-K signed by: Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | "The Company recorded record revenue for the second quarter of 2015 of $45.7 million, a $20.1 million or 79% increase over 2014 second quarter revenue of $25.6 million." (p. 1)<br><br>"Parker H. "Pete" Petit, Chairman and CEO, said, 'We had another excellent quarter. Our $45.7 million second quarter revenue was at the upper end of our guidance range of $44 to $46 million. This marks our fifteenth consecutive quarter of meeting or exceeding revenue guidance.'" (p. 1) | WW |
|---|---|---|---|---|
| 21 | 10-Q for Q2 2015 (filed 8/7/15) | Issued by: MiMedx<br><br>Signed by: Senken<br><br>Certified pursuant to Sarbanes-Oxley Act of 2002 ("SOX certified") by: Petit, Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | Reporting net sales of $45,679,000 (p. 5), knowing a material portion of these sales were illegitimate.<br><br>"The Company recognizes revenue when title to the goods transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. In cases where the Company utilizes distributors or ships product directly to the end user, it recognizes revenue upon shipment provided all other revenue recognition criteria have been met." (p. 8)<br><br>"the Company's Chief Executive Officer [Petit] and Chief Financial Officer [Senken] concluded that the Company's [disclosure] controls and procedures were effective as of the end of the period covered by this report" (p. 26) | VV |
| 22 | 8-K, Ex. 99.1 (dated 10/29/15) | Issued by: MiMedx<br><br>8-K signed by: Senken<br><br>Reviewed and approved by: Petit, Taylor, | "The Company recorded record revenue for the third quarter of 2015 of $49.0 million, a $15.5 million or 46% increase over 2014 third quarter revenue of $33.5 million." (p. 1)<br><br>"Parker H. "Pete" Petit, Chairman and CEO, said, 'We had a very good quarter with revenue in the upper range of our | YY |

# APPENDIX 1
## Selected Fraudulent Statements

| | | Senken, Dewberry, Evans, MiMedx | guidance. Our nine month revenue of $135.5 million was a 72% increase over 2014, and our third quarter revenue grew by 46% to $49 million, compared to an exceptional third quarter of 2014. The third quarter marked our 16th straight quarter of meeting or exceeding our revenue guidance and our 15th consecutive quarter of recording positive Adjusted EBITDA*.'" (p. 3) | |
|---|---|---|---|---|
| 23 | 10-Q for Q3 2015 (filed 11/6/15) | Issued by: MiMedx<br><br>Signed by: Senken<br><br>Certified pursuant to Sarbanes-Oxley Act of 2002 ("SOX certified") by: Petit, Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | Reporting net sales of $49,015,000 (p. 5), knowing a material portion of these sales were illegitimate.<br><br>"The Company recognizes revenue when title to the goods transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. In cases where the Company utilizes distributors or ships product directly to the end user, it recognizes revenue upon shipment provided all other revenue recognition criteria have been met." (p. 8)<br><br>"the Company's Chief Executive Officer [Petit] and Chief Financial Officer [Senken] concluded that the Company's [SEC disclosure] controls and procedures were effective as of the end of the period covered by this report" (p. 25) | **XX** |
| 24 | 8-K, Ex. 99.1 (dated 2/23/16) | Issued by: MiMedx<br><br>8-K signed by: Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | "For the year ended December 31, 2015, the Company recorded record revenue of $187.3 million, a $69.1 million or 58% increase over 2014 revenue of $118.2 million." (p. 1)<br><br>"Parker H. "Pete" Petit, Chairman and CEO, said, "The fourth quarter marked our 17th straight quarter of meeting or exceeding our revenue guidance." (p. 3) | **ZZ** |

# APPENDIX 1
# Selected Fraudulent Statements

| 25 | 10-K for Q4 and full year 2015 (filed 2/29/16) | Issued by: MiMedx<br><br>Signed by: Petit, Taylor, Senken<br><br>SOX certified by: Petit, Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | Reporting net sales of $187,296,000 (p. 33), knowing a material portion of these sales were illegitimate.<br><br>"The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. In cases where the Company utilizes distributors or ships products directly to the end user, it recognizes revenue according to the shipping terms of the agreement provided all revenue recognition criteria have been met." (p. 35)<br><br>"our Chief Executive Officer [Petit] and Chief Financial Officer [Senken] concluded that our [SEC] disclosure controls and procedures were effective as of the end of the period covered by this Annual Report on Form 10-K" (p. 70) | **Y** |
| --- | --- | --- | --- | --- |
| 26 | 8-K, Ex. 99.1 (dated 4/26/16) | Issued by: MiMedx<br><br>8-K signed by: Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | "The Company recorded record revenue for the 2016 first quarter of $53.4 million, a $12.6 million or 31% increase over 2015 first quarter revenue of $40.8 million." (p. 1) | **BBB** |
| 27 | 10-Q for Q1 2016 (filed 5/10/16) | Issued by: MiMedx<br><br>Signed by: Senken<br><br>Certified pursuant to Sarbanes-Oxley Act of | Reporting net sales of $53,367,000 (p. 5), knowing a material portion of these sales were illegitimate.<br><br>"The Company recognizes revenue when title to the goods transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. In cases where the Company utilizes | **AAA** |

# APPENDIX 1
# Selected Fraudulent Statements

|  |  | 2002 ("SOX certified") by: Petit, Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | distributors or ships product directly to the end user, it recognizes revenue upon shipment provided all other revenue recognition criteria have been met." (p. 9)<br><br>"the Company's Chief Executive Officer [Petit] and Chief Financial Officer [Senken] concluded that the Company's [SEC disclosure] controls and procedures were effective as of the end of the period covered by this report" (p. 28) |  |
|---|---|---|---|---|
| 28 | 8-K, Ex. 99.1 (dated 7/26/16) | Issued by: MiMedx<br><br>8-K signed by: Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | "The Company recorded record revenue for the 2016 second quarter of $57.3 million, an $11.6 million or 26% increase over 2015 second quarter revenue of $45.7 million." (p. 1)<br><br>"Petit added, "With respect to profitability, the second quarter was our 18th consecutive quarter of recording positive Adjusted EBITDA*." (p. 3) | **DDD** |
| 29 | 10-Q for Q2 2016 (filed 8/2/16) | Issued by: MiMedx<br><br>Signed by: Senken<br><br>Certified pursuant to Sarbanes-Oxley Act of 2002 ("SOX certified") by: Petit, Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | Reporting net sales of $57,342,000 (p. 5), knowing a material portion of these sales were illegitimate.<br><br>"The Company recognizes revenue when title to the goods transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. In cases where the Company utilizes distributors or ships product directly to the end user, it recognizes revenue upon shipment provided all other revenue recognition criteria have been met." (p. 9)<br><br>"the Company's Chief Executive Officer [Petit] and Chief Financial Officer [Senken] concluded that the Company's [SEC disclosure] controls and procedures were effective as of the end of the period covered by this report" (p. 29) | **CCC** |

# APPENDIX 1
## Selected Fraudulent Statements

| | | | | |
|---|---|---|---|---|
| 30 | 10-Q for Q3 2016 (filed 11/8/16) | Issued by: MiMedx<br><br>Signed by: Senken<br><br>Certified pursuant to Sarbanes-Oxley Act of 2002 ("SOX certified") by: Petit, Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | Reporting net sales of $64,429,000 (p. 5), knowing a material portion of these sales were illegitimate.<br><br>"The Company recognizes revenue when title to the goods transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. In cases where the Company utilizes distributors or ships product directly to the end user, it recognizes revenue upon shipment provided all other revenue recognition criteria have been met." (p. 9)<br><br>"the Company's Chief Executive Officer [Petit] and Chief Financial Officer [Senken] concluded that the Company's [SEC disclosure] controls and procedures were effective as of the end of the period covered by this report" (p. 28) | **EEE** |
| 31 | 10-K for Q4 and full year 2016 (filed 3/1/17) | Signed by: Petit, Taylor, Senken<br><br>SOX certified by: Petit, Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans | Reporting net sales of $245,015,000 (p. 37), knowing a material portion of these sales were illegitimate.<br><br>"The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. The Company records revenues from sales to our independent stocking distributors at the time the product is shipped to the distributor. Our stocking distributors, who sell the products to their customers or sub-distributors, contractually take title to the products and assume all risks of ownership at the time of shipment. Our stocking distributors are obligated to pay us the contractually agreed upon invoice price within specified terms regardless of when, if ever, they sell the products. Our stocking distributors do not have any contractual rights of return or exchange other than for defective product or | **Z** |

14

# APPENDIX 1
## Selected Fraudulent Statements

| | | | shipping error; however, in limited situations, we do accept returns or exchanges at our discretion." (p. 56) | |
|---|---|---|---|---|
| **32** | 10-Q for Q1 2017 (filed 5/1/17) | Issued by: MiMedx<br><br>Signed by: Senken<br><br>Certified pursuant to Sarbanes-Oxley Act of 2002 ("SOX certified") by: Petit, Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | Reporting net sales of $72,607,000 (p. 5), knowing a material portion of these sales were illegitimate.<br><br>"The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. The Company records revenues from sales to our independent stocking distributors at the time the product is shipped to the distributor. Our stocking distributors, who sell the products to their customers or sub-distributors, contractually take title to the products and assume all risks of ownership at the time of shipment. Our stocking distributors are obligated to pay us the contractually agreed upon invoice price within specified terms regardless of when, if ever, they sell the products. Our stocking distributors do not have any contractual rights of return or exchange other than for defective product or shipping error; however, in limited situations, we do accept returns or exchanges at our discretion." (p. 9) | **FFF** |
| **33** | 10-Q for Q2 2017 (filed 7/31/17) | Issued by: MiMedx<br><br>Signed by: Senken<br><br>Certified pursuant to Sarbanes-Oxley Act of 2002 ("SOX certified") by: Petit, Senken<br><br>Reviewed and approved by: Petit, Taylor, | Reporting net sales of $76,412,000 (p. 5), knowing a material portion of these sales were illegitimate.<br><br>"The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. The Company records revenues from sales to our independent stocking distributors at the time the product is shipped to the distributor. Our stocking distributors, who sell the products to their customers or sub-distributors, contractually take title to the products and assume all risks of | **GGG** |

# APPENDIX 1
## Selected Fraudulent Statements

| | | Senken, Dewberry, Evans, MiMedx | ownership at the time of shipment. Our stocking distributors are obligated to pay us the contractually agreed upon invoice price within specified terms regardless of when, if ever, they sell the products. Our customers and stocking distributors do not have any contractual rights of return or exchange other than for defective product or shipping error; however, in limited situations, we do accept returns or exchanges at our discretion." (p. 9) | |
|---|---|---|---|---|
| 34 | 10-Q for Q3 2017 (filed 10/31/17) | Issued by: MiMedx<br><br>Signed by: Senken<br><br>Certified pursuant to Sarbanes-Oxley Act of 2002 ("SOX certified") by: Petit, Senken<br><br>Reviewed and approved by: Petit, Taylor, Senken, Dewberry, Evans, MiMedx | Reporting net sales of $84,573,000 (p. 5), knowing a material portion of these sales were illegitimate.<br><br>"The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. The Company records revenues from sales to our independent stocking distributors at the time the product is shipped to the distributor. Our stocking distributors, who sell the products to their customers or sub-distributors, contractually take title to the products and assume all risks of ownership at the time of shipment. Our stocking distributors are obligated to pay us the contractually agreed upon invoice price within specified terms regardless of when, if ever, they sell the products. Our customers and stocking distributors do not have any contractual rights of return or exchange other than for defective product or shipping error; however, in limited situations, we do accept returns or exchanges at our discretion." (p. 9) | **HHH** |
| 35 | 8-K, Ex. 99.1 (dated 4/26/18) | Issued by: MiMedx<br><br>8-K signed by: Senken<br><br>Reviewed and approved by: Petit, Taylor, | "first quarter of [2018] revenue growth is a clear demonstration of the strength of our product lines, our sales management system and talent we have assembled in our sales and other key functions within our organization.  Based upon our strong first quarter performance, we have raised our full year revenue guidance from a | **T** |

16

## APPENDIX 1
## Selected Fraudulent Statements

| | | Senken, Dewberry, Evans, MiMedx | previous range of $383 million to $387 million to a revised range of $389 million to $394 million." (p. 1) | |
|---|---|---|---|---|
| | | | "As required, no later than May 1, 2018, the Company intends to submit a plan to NASDAQ to regain Compliance…. MiMedx intends to take all necessary steps to achieve compliance with the NASDAQ continued listing requirements as soon as practicable" (p. 3) | |